839 So.2d 439 (2003)
STATE of Louisiana
v.
Westley JONES, Jr.
No. 02-1176.
Court of Appeal of Louisiana, Third Circuit.
February 5, 2003.
Rehearing Denied March 26, 2003.
J. Phil Haney, District Attorney, Thomas C. Senette, Assistant District Attorney, Franklin, LA, for State/Appellee, State of Louisiana.
Louisiana Appellate Project, Carey J. Ellis, III, Rayville, LA, for Defendant/Appellant, Westley Jones, Jr.
*440 Court composed of JOHN D. SAUNDERS, BILLIE COLOMBARO WOODARD and ELIZABETH A. PICKETT, Judges.
PICKETT, Judge.
On May 10, 2001, the defendant, Westley Jones, Jr., was indicted by a grand jury for the charges of aggravated rape, in violation of La.R.S. 14:42, and second degree kidnapping, in violation of La.R.S. 14:44.1. On May 30, 2001, the defendant was arraigned, and he pled not guilty to the charges. Jury selection began in this matter on March 4, 2002, and the trial lasted until March 7, 2002.
On March 7, 2002, the jury returned guilty verdicts as to both charges. Defense counsel filed a Motion for New Trial on March 13, 2002, and this motion was denied on the same day. On March 13, 2002, the defendant waived sentencing delays and was sentenced to life imprisonment without benefit of probation, parole, or suspension of sentence for the offense of aggravated rape and to forty years at hard labor for the offense of second degree kidnapping. Defense counsel moved to appeal the defendant's convictions on this same date.
The defendant presents one assignment of error in this appeal: "[t]he State failed to present sufficient evidence to support the verdicts, convictions of second degree kidnapping and aggravated rape."

FACTS
On the morning of March 11, 2001, the defendant kidnapped the victim from the parking lot of a Wal-Mart store in Lafayette. The defendant repeatedly threatened to kill the victim, and the victim was stabbed multiple times while the defendant brought the victim to a secluded area in St. Martin Parish. The defendant raped the victim in the secluded area of St. Martin Parish, and the victim was only able to escape from the defendant when she jumped out of the moving vehicle which the defendant was driving.

ERRORS PATENT
In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we note one error patent involving the defendant's sentence for second degree kidnapping. La. R.S. 14:44.1 requires that at least two years of the sentence be imposed without benefit of parole, probation or suspension of sentence. For second degree kidnapping, the defendant was sentenced to serve forty years at hard labor to run concurrently with the sentence he received for aggravated rape. The judge failed to impose any portion of the sentence without benefits; thus, the defendant received an illegally lenient sentence.
The supreme court has held that an appellate court may recognize an illegally lenient sentence on its own pursuant to La.Code Crim.P. art. 882. State v. Williams, 00-1725 (La. 11/28/01); 800 So.2d 790. Thus, this court may recognize the trial court's failure to impose at least two years of the sentence without benefits. Therefore, we vacate the sentence imposed for second degree kidnapping and remand for resentencing consistent with this opinion.

DISCUSSION
In his sole assignment of error, the defendant contends that "[t]he State failed to present sufficient evidence to support the verdicts, convictions of second degree kidnapping and aggravated rape." The defendant asserts that he is not the person who committed these crimes and that this is a case of mistaken identity. The defendant points out in his brief that "[t]hroughout *441 this proceeding, the Defendant did not deny that these horrible crimes had occurred, but maintained that he was not the person who committed them." Although the defendant suggests that this case is about mistaken identity, due to the general nature of his brief, we will conduct a full review of the sufficiency of the evidence.
The analysis for sufficiency claims is well-settled:
When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, rehearing denied, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); State ex rel. Graffagnino v. King, 436 So.2d 559 (La. 1983); State v. Duncan, 420 So.2d 1105 (La.1982); State v. Moody, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the Jackson standard of review. See State ex rel. Graffagnino, 436 So.2d 559 (citing State v. Richardson, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.
State v. Kennerson, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97); 695 So.2d 1367, 1371, appeal after remand, 97-1682 (La.App. 3 Cir. 6/3/98); 715 So.2d 518.
The defendant was charged with the offenses of aggravated rape and second degree kidnapping. With respect to the charge of aggravated rape, La.R.S. 14:42(A) provides:
A. Aggravated rape is a rape committed upon a person sixty-five years of age or older or where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:
(1) When the victim resists the act to the utmost, but whose resistance is overcome by force.
(2) When the victim is prevented from resisting the act by threats of great and immediate bodily harm, accompanied by apparent power of execution.
(3) When the victim is prevented from resisting the act because the offender is armed with a dangerous weapon.
(4) When the victim is under the age of twelve years. Lack of knowledge of the victim's age shall not be a defense.
(5) When two or more offenders participated in the act.
(6) When the victim is prevented from resisting the act because the victim suffers from a physical or mental infirmity preventing such resistance.
With respect to the charge of second degree kidnapping, La.R.S. 14:44.1 provides, in pertinent part:
A. Second degree kidnapping is the doing of any of the acts listed in Subsection B wherein the victim is:
(1) Used as a shield or hostage;
(2) Used to facilitate the commission of a felony or the flight after an attempt to commit or the commission of a felony;

*442 (3) Physically injured or sexually abused;
(4) Imprisoned or kidnapped for seventy-two or more hours, except as provided in R.S. 14:45(A)(4) or (5); or
(5) Imprisoned or kidnapped when the offender is armed with a dangerous weapon or leads the victim to reasonably believe he is armed with a dangerous weapon.
B. For purposes of this Section, kidnapping is:
(1) The forcible seizing and carrying of any person from one place to another; or
(2) The enticing or persuading of any person to go from one place to another; or
(3) The imprisoning or forcible secreting of any person.
The victim, Ellen Crawford, testified at the defendant's trial about her kidnapping and rape. The victim testified that she had been shopping at Wal-Mart on the morning of March 11, 2001, and after purchasing her items, she returned to her vehicle in the parking lot of the Wal-Mart. While placing her purchases in her vehicle, the victim stated that "she felt somebody grab [her] and everything went black." The following colloquy occurred between the state and the victim regarding her abduction:
Q. Did you hear anything or was anything said to you by the person who grabbed you?
A. Yes, sir. "Give it up. Get in and drive."

* * *
Q. What was your attacker trying to do at that time?
A. Get me into the truck. That was his main objective. And my main objective was that he would not.
Q. What was your attacker doing to try to get you into the truck?
A. He was stabbing me in the right side of my back.

* * *
Q. Was anything being said by your attacker while he as [sic] doing this?
A. "Get in the truck. Get in the truck. I'll kill you if you don't get in the truck. I'll kill you. I mean it. I'll kill you." He doesn't put "l's" on the ends of his words.
The victim further testified about her kidnapping in the following exchange with the state:
Q. After, after your attacker had started the truck and had you pinned on the floorboard, what happened next?
A. As soon as I heard the motor of the truck start, I knew I had to try to get out of that truck. The only thing I could think of to do: I was laying on my right side. I thought if I kicked that passenger window out, if I break the glass, somebody will hear and see and they will come to my rescue....

* * *
Q. And what was your assailant's reaction to you trying to kick the window out?
A. He stabbed my left leg right here....

* * *
Q. What happens next after he starts the vehicle and begins to drive away?
A. He kept holding my head down and I took the opportunity to look *443 through my hair ... I looked up at him....

* * *
Q. Did he say anything to you while you all were driving?
A. Only threatening me. "You had better stay down. I'll kill you."
When the defendant allowed the victim to sit up, the victim stated that she did not recognize the area where the defendant brought her. The victim testified that defendant raped her in the following exchange with the state:
Q.... You said he raped you. Did he have vaginal intercourse with you?
A. Yes, sir. Yes, sir, he did.
Q. And he did penetrate you?
A. Yes, sir....

* * *
Q. Were you scared for your life at this time?
A. Yes, sir.
Q. Do you think you were going to leave that truck alive?
A. No, sir, I did not. No.

* * *
Q. After the rape, did he make any statements as to what he intended to do with you?
A. Yes, sir. That he had to find somewhere where he could wash me. He didn't want them to find semen on me. Those were his very words.
The victim testified that after the rape, which occurred in her vehicle, the defendant got back into the driver's seat and "began to drive the truck again." The victim further testified about how she leapt out of her vehicle while the defendant was driving in an effort to escape from her captor.
At the defendant's trial, both Charles Brandt and Glen Childress, who are related as brothers-in-law, testified about finding the victim in an isolated area of St. Martin Parish right after she jumped from the vehicle being driven by the defendant. Both Mr. Brandt and Mr. Childress saw the victim as she "rolled out from underneath the vehicle," and they both testified about the victim telling them that she had been kidnapped, raped, and stabbed. Both Mr. Brandt and Mr. Childress testified that the victim's physical appearance was consistent with the victim's story, and both men identified the type of vehicle from which the victim leapt as a "maroon Chevy pick-up."
Detective Kendal Gibson of the Lafayette Police Department testified about his investigation into the kidnapping and rape of the victim. Detective Gibson testified that the victim's vehicle was located on March 12, 2001 (the day after the incident), and was secured and turned over to the Lafayette Police Department's "crime scene personnel." Detective Gibson testified that a "latent print" was removed from the vehicle which matched the defendant's fingerprint. Detective Gibson also testified that a "tip" was received at the Lafayette Police Department regarding the defendant's possible connection to the victim's vehicle. Detective Gibson testified that the woman who called in the "tip" "got [him] connected with Mr. Jones and [they] had made an appointment to meet together...." Through a series of telephone calls to the defendant, Detective Gibson set up other appointments with the defendant after the defendant consistently failed to show up at any of the scheduled appointments.
After receiving the defendant's address through directory assistance, Detective *444 Gibson went to the defendant's house and questioned the defendant after Mirandizing him. Detective Gibson stated, "As I first observed Mr. Jones, which was the first time I made contact with him, I noticed that his body frame and his physical description was matching that of a description given to me by Ms. Crawford." Detective Gibson testified that he arranged a "photographic line-up," including the defendant's picture, to show to the victim. Detective Gibson testified that he showed the line-up to the victim, and the victim identified the defendant in the line-up and "was 100% sure" that the defendant was her assailant.
Detective Gibson testified that Stella Callais was the woman who called in the "tip" at the Lafayette Police Department, and Ms. Callais testified at the defendant's trial. Ms. Callais testified that she had been a friend of the defendant's family for years and that the defendant called her on the morning of the offense between 7:30 a.m. and 8:00 a.m. Ms. Callais stated that the defendant telephoned her from the "RaceTrack" service station across the street from the Wal-Mart where the victim was abducted. Ms. Callais testified that the defendant called her the following morning and that the defendant stopped by her apartment later that day. Ms. Callais testified that the defendant arrived at her apartment in "a burgundy Chevy pick-up truck," although when Ms. Callais asked about the truck, the defendant claimed that he rode "with a friend." Ms. Callais testified that she called the police about the truck, and Ms. Callais helped Detective Gibson get in touch with the defendant. During the defendant's trial, Detective Evans Williams of the St. Martin Parish Sheriff's Office testified that the defendant became a suspect in this case "by the caller tip that was placed by a subject in Lafayette" and by "the prints that was [sic] located inside the vehicle." Detective Williams testified that the victim provided the St. Martin Parish Sheriff's Office with a description of her assailant, and Detective Williams noted that he assisted "in getting a photo line-up to present to the victim." With respect to the photo line-ups, the following colloquy took place between the state and Detective Williams:
Q. Okay. How many line-ups was shown to the victim?
A. There was two line-ups.

* * *
Q. And you were present when both of those line-ups were showed to Ms. Crawford?
A. Yes, sir.
Q. Okay. And what, who did Ms. Crawford pick out?
A. Westley Jones, Jr.
Q. In both line-ups?
A. Both line-ups, 100%.
Q. Did it take her very long?
A. Not long.
Q. I'm sorry what did you say after that?
A. 100%, she positively identified him as being the assailant.
The victim's vehicle was used in the kidnapping, and Detective Dwayne Prejean of the Lafayette Police Department testified about fingerprints that were found in the victim's vehicle. Defense counsel stipulated that Detective Prejean is an expert in fingerprint analysis. Out of nineteen fingerprints that were able to be "lifted" from the interior of the victim's vehicle, Detective Prejean affirmed that five fingerprints matched the defendant. With respect to the fingerprints found in the victim's vehicle, the state asked Detective Prejean, "Any chance those prints were made by someone other than Westley *445 Jones?" Detective Prejean responded, "No." The state asked Detective Prejean, "But what you're saying is that without a doubt, five of those prints that were lifted from the truck belong to Westley Jones, Jr.?" Detective Prejean stated, "That's correct. Without a doubt."
The defendant contends that his fingerprints were in the victim's vehicle because he rode in the vehicle as a passenger. Defense witness Samuel Charles, III, stated that he got a ride from the defendant in a vehicle having the same description as the victim's vehicle. The following colloquy occurred between Mr. Charles and defense counsel:
Q. Okay. And where did you see "Hop"?[1]
A. I seen him on the street in front of a nightclub that I was walking out of.
Q. And did you request anything from him?
A. Yeah. I asked him for a ride to the Waffle House.
Q. Was he alone or was he with somebody?
A. Yeah. He was the passenger in the vehicle and they had another guy there driving, Jacoby.
However, Jennifer Mose, a former police officer with the Lafayette Police Department, testified that she encountered the victim's vehicle on Monday, March 12, 2001, and the victim's vehicle was being driven by the defendant. The following colloquy took place between Ms. Mose and the state:
Q. Bottom line, Officer, you had an unobstructed view of the driver of that vehicle; correct?
A. That is correct.
Q. And the bottom line is you identified that driver in a photo line-up as Westley Jones, Jr.?
A. Yes, I did.
Dr. Jason Chambers, an emergency room doctor, testified that he was the doctor on call when the victim was brought to the emergency room of Gary Memorial Hospital (now St. Martin Hospital). Dr. Chambers testified that the victim told him that she had been kidnapped and raped. The state asked Dr. Chambers, "And Dr. Chambers, you had the opportunity to observe Miss Crawford's physical condition; correct?" Dr. Chambers replied, "Assuredly." The state then asked Dr. Chambers, "And did her physical condition, was it consistent with the statement that she gave you?" Dr. Chambers replied, "The physical condition was consistent with the statement she gave me." Dr. Chambers performed "a rape or sexual assault kit" on the victim which included the collection of specimens from the victim in the form of a vaginal swab and slide. The vaginal swab and slide "were placed in the sexual assault kit and provided to the law enforcement officers" present at the hospital.
Ray Wickenheiser, Laboratory Director of Acadiana Criminalistics Laboratory, testified about the DNA analysis which was performed on the samples obtained from the victim's rape kit. The following colloquy took place between the state and Mr. Wickenheiser:
Q. All right. Not [sic] just so that we are clear: When you talk about a vaginal swab and a vaginal slide, a vaginal swab is similar to a Q-tip type device that is used to swab the vagina for samples; is that correct?
A. That is correct.
Q. Okay. And then the swab is rolled across the slide ...

*446 A. That is correct.
Q .... to deposit any materials that are found?
A. Right. What the objective is to determine if sperm is present. In this case there was sperm found on the slide and identified. And then the next objective is to identify who the sperm may or may not have come from. So in this particular case, once the sperm were identified on those exhibits, then the DNA analysis was conducted.
Further along in Mr. Wickenheiser's testimony, the following exchange took place with the state:
Q. Having created the profile of the male donor, based on the vaginal slide, and comparing that to Westley Jones's reference sample, can you tell me who is the donor? The donor on the vaginal slide?
A. Right. In my opinion, once you get a profile that matches on every area of these 13 areas, my opinion is it originated from the same source. That is the donor of the profile, the sperm that was found in the vaginal slide, and it is the same donor as that of the known sample from Westley Jones.

* * *
Q. So you can say within a scientific certainty that Westley Jones is the donor?
A. Yes....
The following colloquy occurred between the state and the victim during the victim's testimony about her ordeal:
Q. Is there any doubt in your mind that the man in te [sic] courtroom today that you have identified as Westley Jones is the person that abducted you from the Wal-Mart parking lot in Lafayette, seized you against your will, forced you into your truck, stabbed you multiple times, and raped you?
A. Absolutely it is him. I know it is him.

* * *
Q. Any doubt in your mind that that man sitting at that table is the person that abducted you and raped you?
A. No, sir. Not one shred of doubt. He stabbed, he robbed, he kidnaped, and he raped me. He ruined my life. That is him.
The Louisiana Supreme Court in State v. Neal, 00-0674 (La.6/29/01); 796 So.2d 649, stated:
As a general matter, when the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the state is required to negate any reasonable probability of misidentification. State v. Smith, 430 So.2d 31, 45 (La.1983); State v. Brady, 414 So.2d 364, 365 (La.1982); State v. Long, 408 So.2d 1221, 1227 (La. 1982). However, positive identification by only one witness is sufficient to support a conviction. See State v. Mussall, 523 So.2d 1305, 1311 (La.1988) (generally, one witness's positive identification is sufficient to support the conviction); State v. Ford, 28,724 (La.App.2d Cir.10/30/96), 682 So.2d 847, 849-50, writ denied, 99-0210 (La.5/14/99), 745 So.2d 12.... The trier of fact makes credibility determinations and may, within the bounds of rationality, accept or reject the testimony of any witness; thus, a reviewing court may impinge on the "fact finder's discretion only to the extent necessary to guarantee the fundamental *447 due process of law." Mussall, 523 So.2d at 1310 (La.1988).

Id. at p. 11, 658.
In the instant case, staff submits that the state did "negate any reasonable probability of misidentification" through the positive identification of the defendant by the victim, through the fingerprint analysis and identification of the defendant's fingerprints by Detective Prejean, and through the DNA analysis and identification of the defendant's DNA by Mr. Ray Wickenheiser. Thus, it was not unreasonable for the jury to conclude that the defendant was the perpetrator of these crimes.
The evidence and testimony presented at the defendant's trial was sufficient such that "any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Kennerson, 96-1518, p. 5; 695 So.2d 1367, 1371. The victim's testimony regarding her kidnapping and rape was corroborated through the testimony of Mr. Brandt and Mr. Childress who saw the victim as she leapt from her vehicle. The victim's injuries were documented by law enforcement personnel as well as the medical staff at Gary Memorial Hospital. A "rape kit" was performed on the victim, and DNA analysis confirmed that the defendant's sperm was present in samples taken from the victim. Detectives Gibson and Williams testified that the victim quickly identified the defendant from photographic line-ups. Detective Prejean testified that the defendant's fingerprints were "lifted" from the interior of the victim's vehicle. The State proved the elements of each offense beyond a reasonable doubt, and thus, this assignment of error has no merit.

DECREE
The defendant's convictions are affirmed. The defendant's sentence for second degree kidnapping is vacated and the case is remanded to the trial for resentencing consistent with this opinion; in all other respects the sentence imposed by the trial court is affirmed.
CONVICTIONS AFFIRMED; SENTENCE AFFIRMED IN PART; SENTENCE VACATED IN PART; AND REMANDED.
NOTES
[1] The defendant's nickname is "Hop."