# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### KA 03-1385


**STATE OF LOUISIANA**

**VERSUS**

**GARY DEWAYNE HAMILTON**


**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
TENTH JUDICIAL DISTRICT COURT
PARISH OF NATCHITOCHES, NO. C3656
HONORABLE ERIC ROGER HARRINGTON, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

**BILLY HOWARD EZELL
JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of Billie Colombaro Woodard, Oswald A. Decuir, and Billy Howard Ezell, Judges.

**AFFIRMED.**


**Van Hardin Kyzar**
**District Attorney, 10th JDC**
**P. O. Box 838**
**Natchitoches, LA 71458-0838**
**(318) 357-2214**
**Counsel for: Plaintiff/Appellee**
**State of Louisiana**


**Dmitrc Ian Burnes**
**Burnes & Burnes**
**711 Washington Street**
**Alexandria, LA 71309-0650**
**(318) 448-0482**
**Counsel for: Defendant/Appellant**
**Gary Dewayne Hamilton**

**Gary Dewayne Hamilton**
**NPDC**
**299 Edwina St.**
**Natchitoches, LA 71457**

**EZELL, JUDGE.**

The Defendant, Gary Hamilton, was charged by bill of information with one count of attempted second degree murder of Chris Fisher, Joseph Steele, and Sandra Washington in violation of La.R.S. 14:27 and La.R.S. 14:30.1. Following a jury trial on January 21-22, 2003, the Defendant was convicted as charged. On July 18, 2003, he was sentenced to fifteen years at hard labor without benefit of probation, parole, or suspension of sentence. The Defendant's motion for post verdict judgment of acquittal and motion for new trial were denied on June 25, 2003. A motion and order for appeal was granted on July 23, 2003. The Defendant appeals his conviction on several grounds.

## FACTS

On January 12, 2002, the Defendant and at least two other men were involved in a fight with Christopher Fisher. Shortly after the fight, Fisher's aunt and uncle drove him to his nearby home. After Fisher walked out of his house and was getting into the car with his relatives, multiple gunshots were fired into the car. No one was injured in the shooting. The victims were unable to identify the shooters.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by the court for errors patent on the face of the record. After reviewing the record, we find there are no errors patent.

## ASSIGNMENTS OF ERROR NUMBERS ONE AND TWO

The Defendant contends the evidence at trial was insufficient to show that he fired shots at the victims. He asserts that the trial court erred in denying his motion for post verdict judgment of acquittal and motion for new trial on this ground. These arguments will be addressed together.

1

The jury convicted Defendant of attempted second degree murder. Attempt is defined by La.R.S. 14:27, which states, in pertinent part:

A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.

B. Mere preparation to commit a crime shall not be sufficient to constitute an attempt; but lying in wait with a dangerous weapon with the intent to commit a crime, or searching for the intended victim with a dangerous weapon with the intent to commit a crime, shall be sufficient to constitute an attempt to commit the offense intended.

Second degree murder is defined by La.R.S. 14:30.1, which states, in pertinent part:

A. Second degree murder is the killing of a human being:

(1) When the offender has a specific intent to kill or to inflict great bodily harm; or

(2)(a) When the offender is engaged in the perpetration or attempted perpetration of aggravated rape, forcible rape, aggravated arson, aggravated burglary, aggravated kidnaping, second degree kidnaping, aggravated escape, drive-by shooting, armed robbery, first degree robbery, or simple robbery, even though he has no intent to kill or to inflict great bodily harm.

At trial, Joseph Steele testified that he attended his grandmother's ninetieth birthday party on January 12, 2002, in Natchitoches. Steele stated that he is a manager of a repair department. He explained that he was convicted of simple burglary in 1993, but has not received as much as a traffic ticket since his parole in 1995. He testified that around 11:00 p.m. the party ended and he and his family went to his sister's house at the corner of Dixie and Hill Streets. Steele testified that he heard a fight outside and saw his nephew, Fisher, fighting with three men in a car. He pulled Fisher out of the car and the men drove away. He testified he did not know any of the men or have descriptions of them.

2

Steele stated that about thirty minutes later he and his wife drove Fisher to his home on Dixie Street to change clothes. He testified as follows:

A.     Well, he was in there about ten (10) minutes, maybe fifteen (15) at the most. So, I blew the horn for him to come out. He came out, he got in the car, he got back out the car to get something out of the trunk . . . a sweater or something. And he got . . . as he got back in the car, when I turned around, or put the car in reverse, that's when I saw the guys jump out from around the back of the house. Okay, by this time they came up with guns . . . what I saw was guns. I saw the reflection of one, and I assumed they was fixing to shoot. And I told my wife to, "Get down, get down." I pushed her down in the seat, and I slumped down, and threw the car in reverse and begin to back out. And as I was backing out, they started shooting.

          . . . .

A.     Well, actually the first bullet I saw, hit my hood, and uh . . . ricocheted off the hood. I saw the fire from it. And it hit like where my face was, and I did like that, and it hit car and they just kept shooting.

Q.     All right. Do you know how many shots you heard fired?

A.     Maybe twelve (12), fifteen (15) shots, something like that.

Q.     Okay. Uh . . . what did you do then?

A.     I threw it in drive, and headed toward the police, which were actually two (2) blocks straight down from where we were on the corner of Dixie and Hill at that time. There was about six (6) cars of police there.

He stated both of his front tires were flat, and his windshield, mirror and gas tank were shot out. Steele testified that his Cadillac was struck about eight times, with other bullets hitting the hood, left front fender, and side panel. He identified the photographs taken of his car after the shooting.

Steele's wife, Sandra Washington, was sitting in the front passenger seat. Fisher was seated behind Steele in the back seat. No one was injured in the shooting.

Steele testified that he saw two shooters, both black males, with one shorter than the other. He could not describe the clothing the two shooters were wearing.

3

He stated he could not see the shooters faces, and could not identify them. Steele denied giving the police the Defendant's name as a suspect.

Christopher Fisher testified that he has a criminal record and has served a total of eleven-and-a-half years behind bars. He stated he last got out of jail on April 26, 2001, and was working as a supervisor at Walmart. Fisher testified that he attended his great-grandmother's party and then went to his mother's house at Dixie and Hill Streets at about 11:00 p.m. He stated that he was walking his sister to her car across the street when a speeding car swerved and almost hit her. After yelling at the men in the car, Fisher saw the car stop and a man get out. Fisher identified the Defendant in court as the man who got out of the car with a glass Hennessy liquor bottle in his hand. The two had words. Fisher testified that he thought the Defendant was going to hit him with the raised bottle, so he began fighting with him. Fisher then began fighting with the two men in the backseat of the car before he was pulled off by family members. He also stated that a fourth man, Larry Hamilton, had jumped out of the car and disappeared. Fisher testified that as the three men drove off, he heard one of them yell "Nigger, I know where you at. I'm a get you."

Fisher testified that he went home to change clothes about fifteen minutes later. He stated:

> And I was getting ready to leave . . . you know what I'm saying. So when I got ready to go get back in my uncle's car, I had to get something out of the trunk, I get in the car, and the next thing you know they telling me, "Man, get down." Just like that, but I was like almost already in the car. And he grabbed his wife's head, and pulled his wife's head down, and they just started shooting.

He stated he did not know how many shots were fired.

Fisher stated that he could not identify the shooters. He testified that the first man he hit in the fight was "G-Nut." Fisher told police he had been in a fight with G-Nut. Fisher testified that he did not know how many shooters there were. He stated

4

that when he was interviewed by Detective Payne he gave the names or nicknames of the men who were in the car during the fight. Fisher testified that he did not tell police that the Defendant was the shooter.

On cross examination, Fisher testified regarding the identification of the Defendant as follows:

Q.    And you can't under oath on this witness stand today, sit there and honestly say "Gary Hamilton shot at me"?

A.    Can't say.

Q.    Okay.

A.    I didn't see him.

Q.    Did you ever tell the District Attorney's Office that Gary Hamilton shot at you?

A.    Did I ever tell them that?

Q.    Yes, sir.

A.    In my . . . I told them that I felt like it. I think, because the altercation had just happened. So, yeah . . . yes, ma'am.

Q.    You told him it was Gary Hamilton who shot at you?

A.    I say Gary Hamilton and Kabookie.

Q.    Okay. You told the D.A.'s office that, but it's now your testimony that you don't know if he did?

A.    (Inaudible) . . .

Q.    I'm not asking you what you felt.

A.    Okay, what I felt ma'am . . . it was . . .

Q.    I'm not asking you, sir, what you felt. Is your testimony today that you do not know that Gary Hamilton, you don't know that he was the shooter?

A.    No, ma'am.

Q.    Okay. So, when you told that to the police department you were interpreting what you believed happened?

A.    Yes, ma'am.

Q.    Okay. So, when you told Christopher Payne that, you were basing it on what you believed, not what you saw?

A.    Yes, ma'am.

Fisher read an affidavit he signed that was written and notarized by an attorney. The affidavit, D-1, states: "Christopher L. Fisher who, being duly sworn, stated that in the shooting of his vehicle on the 12th day of January 2002 he did not see nor does he believe that Gary Hamilton was involved in the altercation." Fisher explained the affidavit as follows:

A.    Ms. Johnson, I went and talked to Ms. Johnson. And I explained to her . . . cause she had called me one time and asked me to come in and talk to her. And she asked me, she say, "Did you see Larry Hamilton and Gary Hamilton shoot at you?" I said, "No ma'am, I didn't see nobody." Because I wasn't trying to pay attention on who was shooting at me, my thing was trying to make sure I don't get hit. So, she said, "Well, could you say . . . do you believe that he shot at you?" I say, "Well, quite naturally I do, cause we just had a fight." And the words was that, "We'll be back. We gon[sic] get you." And that wasn't even no more than about twenty (20) or thirty (30) minutes, and that's all I said.

Q.    Okay. The part of the affidavit where is says, uh . . . "Nor does he believe that Gary Hamilton was involved in the altercation." Is that true?

A.    No. No, sir.

Q.    Okay. Immediately after the uh . . . the altercation, did you explain to the police officers what exactly happened?

A.    Yes, sir.

Q.    Did you give them Gary Hamilton's name?

A.    I just gave them G-nut. I didn't know his name was Gary Hamilton.

He testified that he did not intend to suggest that the Defendant did not have anything to do with the shooting.

6

The Defendant and Fisher spoke some time after the shooting at a local bar. Fisher testified the conversation was about "squashing it." He explained as follows:

> A. To . . . to leave it alone. You know what I'm saying that . . . he . . . what he explained to me is that he didn't know it was me, and he didn't know me, or whatever. And you know, that it was cool, and that you know . . . and I was telling him like, you know, "I'm not tripping, but you know . . . y'all shot at me nineteen (19) times, man. You know what I'm saying? It wasn't just my life. You had my uncle and auntie life. You know what I'm saying. If that comes from you not thinking, but then when you get out on bond, you know what I'm saying, you want to be like, well, let's just squash it."

On cross examination, Fisher admitted that the Defendant never said he was talking about the shooting, and it was possible he was referring to the fight. On cross examination, Fisher was extensively questioned about his occupation. He stated he is currently self-employed producing records in Dallas, Texas. Fisher stated that he is on parole and is in good standing with his parole officer. Fisher testified that he makes enough money to pay his bills. He said he filed taxes last year on his Walmart job. However, he admitted he did not pay taxes on the money he earned producing records in Natchitoches before moving to Texas because he did not make very much. Defense counsel questioned Fisher about his living arrangements and how he paid his bills. Fisher denied being a drug dealer. Fisher outlined his criminal record. He stated he pled guilty to possession of cocaine, possession of cocaine with the intent to distribute, unauthorized use of a movable, and carnal knowledge of a juvenile, and was convicted of auto theft. Regarding the night in question, Fisher stated that he had one beer before the fight with the Defendant occurred, but denied being "buzzed." Fisher admitted that it was a violation of his parole to drink alcohol.

Bonevelyn Powell, Chris Fisher's sister, corroborated Fisher's account of the fight with the Defendant and the other men. She testified that the Defendant was the driver of the car that almost hit her. About thirty minutes after the fight, Powell drove to her mother's house nearby and heard gunshots. She never gave the police the

7

Defendant's name, but did identify him from a police photograph as the man who fought with her brother. Powell stated that she is a CEO of a company in Dallas. She said she did not know what her brother's job was in Dallas, nor where he lived.

Sandra Washington, wife of Joseph Steele, testified that she witnessed the fight but could not identify the men involved. Washington described the shooting as follows:

> A.     And we started to back out, and as we were backing out, I kind of focused because it was real dark behind the house. It was. . .it was dark because it was a light on. . .I remember a light being on under the carport. But, when they came. . .I could see figments of people. And I know it was more than one person, but I don't know how many people it was. And I could just see them with their hands pointed.

> Q.     Okay. At that time, did you. . .did you realize they had the guns?

> A.     I figured to be. . .in that position like they was, they had to have something. And I. . .

> Q.     (Inaudible).

> A.     It triggered in my mind about the fight that we had just had, so. . .I figured it was a retaliation or something. I didn't. . .(inaudible). I just was. . .I just. . .

> Q.     What did you do?

> A.     I went under the dashboard of the car.

> Q.     Okay.

> A.     I just went under the dashboard. And they started shooting, and. . .we backed out. . .well, my husband managed to back on out and some kind of way he got us out of there.

> Q.     Okay, do you know how many shots were fired? Do you have any idea?
> A.     Oh, I don't know, but it sounded like a lot.

> Q.     Okay. Do you know how many people were shooting? Could you see?

8

A. I couldn't see how many were shooting, but. . .I'm saying it sound like it could have been more than one person shooting. . . (inaudible).

Q. Could you hear the bullets striking the car?

A. Uh, uh.

Q. Did you have any thoughts that you may be killed?

A. Oh, yes.

Q. Okay. Did the shooting take place only as you backed out, or your husband backed out of the driveway? Or did the shooting continue while you were still on Dixie Street and as you pulled off?

A. Well, it sound like as we were pulling off, they were coming, like on the side. I don't . . . I don't. . .

Q. On the side of the house or the car?

A. Car . . . when we backed out, and the he had to come out to go . . . to the uh, we was trying to get to the corner, because we knew the police were down there. It sounded like something was hitting the sides as we were taking off to go forward.

She could not identify the shooters.

Natchitoches City Police Detective Christopher Payne testified he was called to the crime scene at 1225 Ellis Street to investigate the shooting. He found multiple shell casings all along the carport area and the side of the house. Detective Payne identified the photographs taken of the locations where the shell casings were found. He specifically identified Exhibit S-7 as an item found in the driveway of the house. Payne identified the eight 10mm shell casings and nine 9mm brass shell casings that he collected for evidence at the scene. A lead projectile and casing were also collected from the body of Joseph Steele's Cadillac. Detective Payne identified the photographs he took of the Steele vehicle. He explained that the photographs show projectile strikes to the hood, driver's front fender, bumper, windshield, driver's door, and flat

9

tires. Several bullet strikes were found on the Haskett residence across the street from the scene of the shooting. He stated that he suspected there were at least two shooters and they were on foot.

Statements were taken by Detective Payne from Fisher, Steele, and Powell. He issued a BOLO (Be On the Lookout For) for the Defendant based on the information that Fisher gave him. The Defendant was picked up by another officer and brought to the station for questioning. Detective Payne interviewed the Defendant after he was Mirandized. The Defendant admitted he was involved in an altercation with Fisher. Payne testified that he first asked about the fight then asked the Defendant why he had ammunition in his vehicle and the Defendant did not comment. Detective Payne admitted that the Defendant denied being involved in the shooting. The Defendant signed a permission form to search his vehicle, which was located in the parking lot of the police station. Detective Payne identified the photographs he took of the inside of the Defendant's vehicle. He stated that Ex. S-13d shows a box of Remington 10mm shells located in the back seat of the Defendant's vehicle on the passenger side. He further identified the ammunition box recovered in evidence. Detective Payne testified that there were eight 10mm cartridges missing out of the box. He also found a latex rubber glove in the glove compartment of the Defendant's vehicle. Detective Payne testified that after collecting the evidence and interviewing the victims, he arrested the Defendant and two other individuals.

Detective Payne stated the others investigated along with the Defendant were Robert "Kabookie" Burr, Marcus Slaughter, and Tony Hamilton. Slaughter was interviewed, but not arrested or charged with a crime. Burr was charged with attempted second degree murder. He testified that Hamilton was also charged, but he did not specify what he was charged with. Burr and Slaughter were named as two of the individuals in the back seat of the Defendant's vehicle when the fight occurred.

10

Detective Payne stated that Fisher gave him the name of the Defendant (G-Nut), Marcus (whom he called Slaughter or Tank), Larry Hamilton, and Tony Hamilton. Payne testified that Fisher told him that he felt the Defendant was involved in the shooting. He stated that Fisher did not tell him that he could not identify the shooters. Fisher did not give descriptions of the shooters, or the weapons involved. Detective Payne testified that he was looking for a 9mm and a 10mm semi-automatic pistol, one with a missing part. He explained this information was given to the other detectives in the department as per policy.

Greg Dunn testified that he is the Assistant Chief of Narcotics for the Natchitoches Drug Task Force. He identified S-15 as a firearm that he found while executing a search warrant at 226 Marie Street in Point Place on June 4, 2002. The gun was found some six months after the shooting at issue. Officer Dunn testified that the Defendant and Tameka Means were living at the residence. He stated the firearm was found on the top shelf of a closet in a back bedroom. At the time of the search, the Defendant, Means, and Tyrone Wiley were at the residence. Wiley told police he did not live at the residence. The firearm was missing the safety mechanism. Officer Dunn recalled that a firearm with this description was being sought in connection to a shooting, so he released the gun to Detective Payne.

At trial, Detective Payne identified the Colt Delta Elite 10mm semi-automatic pistol. He testified that he obtained the firearm from Detective Collins some months after the shooting. Detective Payne sent the firearm and the box of 10mm shell casings to the Louisiana Criminalistics Laboratory in Shreveport. On cross examination, Payne testified that no fingerprint analysis was conducted on the shell casings found at the scene of the shooting. He also stated that no fingerprint analysis was requested on the box of ammunition found in the Defendant's vehicle.

11

Richard Beighley, a criminalist with the North Louisiana Crime Lab, testified as an expert in firearms identification. He identified S-15 as the 10mm pistol that he received as evidence. Beighley testified that ballistics tests revealed the bullet jacket in Exhibit S-8 was fired from the 10mm pistol. He further stated that the eight spent 10mm casings in Exhibit S-5 were also found to have been fired from the 10mm pistol. Beighley identified Exhibit S-7 as a safety lever and stated that the 10mm gun he examined was missing a safety lever.

Beighley explained that when he received the 10mm gun it was missing seven different parts and was unsafe to fire. He stated he had the gun repaired before he fired it for ballistic testing. Beighley testified that none of the replaced parts affected his identification of the fired casings. He identified Exhibit S-19 as a photograph he took showing the side by side comparison of the found safety lever and the one that he had installed on the gun. Beighley testified that the found safety lever is compatible with the 10mm pistol. He stated he had no doubt that the eight 10mm casings were fired from the 10mm firearm, Exhibit S-15. Beighley testified that he fired two test shots from the gun. He did not use the ammunition found in the Defendant's car to test fire the gun, but explained that he used the same bullet design with the same manufacturer's markings.

Justin Austin stated that he was subpoenaed by the State to testify. Fisher testified that he gave Austin's name to police as a witness. Austin stated that before midnight on the date in question he was walking on Dixie Street around Dean Street when he saw "Larry, Gary, and Robert" walking past him. He did not know exactly what time he saw the men. Austin gave the police his statement in February 2002. His statement reflected that he saw the three men just before midnight. On cross examination, Austin stated that he had not been drinking or doing drugs that night. He testified that he did not know the Defendant by name. Austin testified that his

God-brother, Chris Fisher, gave him the Defendant's name. Austin identified the Defendant in open court and stated that his nickname was G-Nut. He testified that the Defendant was one of the three men he saw walking that night.

**Motion for Post Verdict Judgment of Acquittal**

Louisiana Code of Criminal Procedure Article 821(B) states that a motion for post verdict judgment of acquittal "shall be granted only if the court finds that the evidence, viewed in a light most favorable to the state, does not reasonably permit a finding of guilty." Regarding Defendant's claim that the evidence was insufficient, this court has explained the analysis as follows:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

Further, when the conviction is based upon circumstantial evidence, La.R.S. 15:438 provides that such evidence must exclude every reasonable hypothesis of innocence. *State v. Camp*, 446 So.2d 1207 (La.1984); *State v. Wright*, 445 So.2d 1198 (La.1984). However, La.R.S. 15:438 does not establish a stricter standard of review on appeal than the rational juror's reasonable doubt standard. The statute serves as a guide for the jury when considering circumstantial evidence. This is a case of circumstantial evidence. There is no physical evidence or witness identification to

13

show the Defendant was involved in the shooting. On appeal, the issue is whether a rational trier of fact, when viewing the evidence in a light most favorable to the prosecution, could find that all reasonable hypotheses of innocence were excluded.

The Defendant argues the evidence fails to disclose any facts which directly link him to the shooting. He contends that the circumstantial evidence could apply to any of the other individuals who were in his car during the altercation earlier in the evening. The Defendant asserts that the three other men had motive and opportunity to shoot at the victims. He argues that the circumstantial evidence points more toward the two men who were in the back seat of his car, where the box of bullets was found. We observe that this argument omits the fact that sometime after the shooting the 10mm gun used in the shooting was found in a bedroom closet at the house the Defendant shared with his girlfriend. In his brief to this court, the Defendant does not assert any hypothesis of innocence regarding the location of the gun. However, at the hearing on his motions, the Defendant asserted that the 10mm gun found by police could have been hidden at his house by any one of his other friends who were involved in the fight.

Viewing the evidence in the light most favorable to the State, we find the circumstantial evidence was sufficient to uphold the Defendant's conviction. Therefore, this assignment of error is without merit.

**Motion for New Trial**

Louisiana Code of Criminal Procedure Article 851 states, in pertinent part, that a new trial shall be granted when the verdict is contrary to the law and evidence. When evaluating a motion for new trial, the courts are to use the "thirteenth juror standard" for re-weighing the evidence. *State v. Long*, 590 So.2d 694 (La.App. 3 Cir. 1991). However, Defendant is arguing that the evidence was insufficient to convict him, thus, he is requesting a sufficiency review that is more properly considered in a

14

motion for post-verdict judgment of acquittal pursuant to La.Code Crim.P. art. 821.

In *State v. Sykes*, 03-397, pp.2-3 (La.App. 3 Cir. 10/8/03), 857 So.2d 638,641-42, this court has stated the following regarding review of a motion for new trial:

> The supreme court has stated the following regarding the distinction of claims raised in a motion for new trial and a motion for post-verdict judgment of acquittal:
>
>> However, a motion for new trial presents only the issue of the weight of the evidence, *see Tibbs v. Florida*, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982) (setting aside a verdict as against the weight of the evidence, as opposed to the insufficiency of the evidence, under the Due Process Clause does not bar retrial) and is examined under the so-called thirteenth juror standard under which the trial judge re-weighs the evidence. *State v. Voorhies*, 590 So.2d 776, 777 (La.App. 3 Cir.1991). The question of sufficiency is properly raised by a motion for post-verdict judgment of acquittal. La.C.Cr.P. art. 821; *State v. Demery*, 28,396, p. 6 (La.App. 2 Cir. 8/21/96), 679 So.2d 518, 522. *But see* Article 851 comment (d) ("[i]t is the duty of the trial judge to pass upon the sufficiency of the evidence" once ground (1) is raised under Article 851).
>>
>> In the instant case, the constitutional issue of sufficiency is treated in assignment of error number 1 because the denial of a motion for new trial based upon La.C.Cr.P. art. 851(1) is not subject to review on appeal. *State v. Skelton*, 340 So.2d 256, 259 (La.1976) ("[W]e have uniformly held that a bill of exceptions reserved to the refusal of the trial judge to grant a motion for a new trial based on Article 851(1), relative to sufficiency of the evidence presents nothing for our review.") (citations omitted); *State v. Bartley*, 329 So.2d 431, 433 (La.1976) ("It is well established in Louisiana that an assignment of error reserved to the denial of a motion for a new trial alleging that the verdict is contrary to the law and the evidence presents nothing for appellate review.") (citations omitted).
>
> *State v. Snyder*, 98-1078 (La. 4/14/99), 750 So.2d 832, 859, n. 21(alteration in original).
>
> Likewise, we find Defendant's claims that the trial court erred in denying her motion for new trial because the verdict was contrary to the law and evidence presents nothing for this court to review. The only issue reviewable in the present appeal is the constitutional issue of sufficiency of the evidence, which was raised in the Defendant's motion for post-verdict judgment of acquittal.

*See also State v. Hampton*, 98-331 (La. 4/23/99), 750 So.2d 867, *cert. denied*, 528 U.S. 1007,120 S.Ct. 504 (1999) .

Therefore, we find this assignment of error should be considered a sufficiency review. Following a sufficiency review regarding the Defendant's post verdict judgment of acquittal, the court has already resolved this issue and finds it is without merit.

## ASSIGNMENTS OF ERROR NUMBERS THREE AND FOUR

The Defendant contends the trial court erred in denying his oral motion for a mistrial, and in denying his motion for new trial based on the same error. During the cross examination of the victim Christopher Fisher, a remark was made that referred to the Defendant's parole.

Louisiana Code of Criminal Procedure Article 770 states, in pertinent part:

> Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
>
> . . . .
>
> (2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible:
>
> . . . .
>
> An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial.

Article 770 is limited to a comment made by a judge, district attorney, or court official. In the Defendant's case, the remark was made by a State witness while on cross examination. At trial Fisher testified as follows:

Q. Okay. Now, you gave some testimony to Mr. Wright, uh, about you saw my client at a club.

A. Yes, ma'am.

Q. Another violation of your parole, right?

A. His too. Yes, ma'am.

16

The Defendant moved for a mistrial and the jury was removed from the courtroom. The defense attorney argued that Fisher made an unsolicited and improper reference to the Defendant's criminal history. The trial court commented that it was not the State's responsibility to control its witness while he was being cross examined by the defense attorney. The defense attorney stated that the State's witness should have been instructed not to say anything about the Defendant's other crimes.

In denying the motion for mistrial, the trial court stated:

> All right. And your motion is denied for a mistrial. I didn't hear him say it, although I'm not. . .I'm not denying that he said it. But, my point in that is, is that I don't know that the tone and the manner in which he said it had a great impact on the jury. Uh, and I don't think. . .even if they did hear it, I don't know that it's prejudicial enough to matter. If at the time, before I give my instructions, if you are concerned about it enough, I will offer you an instruction, if you would like one, instructing the jury to disregard that.

The defense attorney stated she did not want an instruction.

In *State v. Bishop*, 98-1147, p.9 (La.App. 3 Cir. 2/3/99), 734 So.2d 674, 678-79, *writ denied*, 99-2499 (La. 2/11/00), 754 So.2d 932, this court stated:

> Regarding the scope of our review of trial court rulings on motions for mistrial, a "[m]istrial is a drastic remedy generally and the determination 'of whether prejudice has resulted lies in the sound discretion of the trial judge.'" *State v. Banks*, 96-2227, p. 2 (La.4/18/97); 692 So.2d 1051, 1053 (quoting *State v. Sanders*, 93-0001 (La.11/30/94); 648 So.2d 1272, *cert. denied*, 517 U.S. 1246, 116 S.Ct. 2504, 135 L.Ed.2d 194 (1996); *State v. Smith*, 430 So.2d 31 (La.1983)).
> Since the reference was made by a State witness in response to defense

counsel's questioning, it cannot be said the remark is a basis for mistrial pursuant to Article 770. In addition, we find the Defendant has not shown that he was prejudiced by the brief reference to his being on parole. The admission may have been harmless. If any prejudice existed, it was slight, and therefore the trial court's denial of a mistrial did not constitute reversible error. This assignment of error is without merit.

**ASSIGNMENTS OF ERROR NUMBERS FIVE AND SIX**

These assignments of error will be addressed together as the Defendant asserts the trial court erred in granting the State's oral motion to exclude "guilty of aggravated battery" from the jury verdict form. He further argues the trial court erred in denying his motion for new trial based on the same claim.

The Defendant was charged with attempted second degree murder. The responsive verdicts for attempted second degree murder are listed in La.Code Crim.P. art. 814(A)(4) as follows:

"Attempted Second Degree Murder:

Guilty.

Guilty of Attempted Manslaughter.

Guilty of Aggravated Battery.

Not guilty."

The responsive verdict statute also provides for the exclusion of a responsive verdict. La.Code Crim.P. art. 814(C) states:

> Upon motion of the state or the defendant, or on its own motion, the court shall exclude a responsive verdict listed in Paragraph A, if after all the evidence has been submitted, the evidence, viewed in a light most favorable to the state, is not sufficient reasonably to permit a finding of guilty of the responsive offense.

The Defendant asserts that the trial evidence showed that the shots fired struck the vehicle occupied by the victims. He cites two cases for his proposition that aggravated battery is a proper responsive verdict when the vehicle is struck, instead of the passengers. In *State v. Trahan*, 416 So.2d 65 (La.1982), the Louisiana Supreme Court found that the evidence supported the responsive verdict of aggravated battery for attempted first degree murder because the defendant had tried to run over an officer by ramming his vehicle into the patrol car which the officer was standing nearby. The court stated:

> The evidence establishes physical contact either between the deputy and the Blazer or between the deputy and the patrol car when it was struck

18

> by the Blazer. There is no question that an automobile can constitute a dangerous weapon if used in a manner likely to cause death or great bodily harm.

*Id.* at 68. The court found that the jury could have reasonably found that an aggravated battery was proven.

In *State in the Interest of H.L.F. and R.J.T.*, 97-2651 (La.App. 4 Cir. 5/20/98), 713 So.2d 810, the fourth circuit affirmed the juvenile's adjudication for aggravated battery. The court stated:

> In the instant case, the State contends that H.L.F. intentionally collided into two cars in a manner which caused injury to at least one of the victims, Officer Kevin Stamp. It is not necessary for the contact to be between the dangerous weapon and the victim, as long as the dangerous weapon (the car) exerts a force calculated or likely to cause great bodily harm or death to the victim.

*Id.* at 812.

In response, the State cites *State v. Dauzat*, 392 So.2d 393 (La.1980) for the holding that aggravated battery was not a proper responsive verdict to attempted second degree murder when the defendant fired several shots into the victim's vehicle. The Louisiana Supreme Court stated:

> The defendant shot his gun in Guillot's direction. The bullets lodged in the door of Guillot's car. Guillot testified at trial that he was not touched by the defendant or by the bullets. Since there is no evidence to establish the presence of the essential element of the crime of battery contact with the person of another-the verdict of guilty of aggravated battery must be reversed.

*Id.* at 397. *See also State v. Schenck*, 513 So.2d 1159 (La.1987).

At trial, the State argued that since there was no evidence that any of the three victims were injured in the shooting, that the element of battery requiring contact with the person of another was not satisfied. The Defendant argued that because he was charged with **attempted** second degree murder, then the aggravated battery responsive verdict should read **attempted** aggravated battery. He contended the facts of the shooting fit the definition of attempted aggravated battery, but did not fit the definition

19

of aggravated battery. The trial court granted the State's motion to remove aggravated battery as a responsive verdict, without stating reasons therefore.          At the hearing on the post verdict motions, the defense counsel explained further:

> uh, I contend here that, uh, uh, that the evidence could support the Aggravated Battery. Uh, if this were a case where my client had been accused of taking his car and ramming it into the other client's car. There'd be no question about it. Uh, however, here's a case of saying instead of hitting there[sic] car with a car, the State's contending that he hit there[sic] car with a little piece of metal, not a big piece of metal. I believe that uh, Aggravated Battery, uh, absolutely should have been maintained as uh, responsive verdict in this case.

The trial court denied the motion, without stating reasons for its decision.

We note the crime of battery requires the intentional use of force or violence upon the person of another. La.R.S. 14:33. In *State v. Howard*, 94-23, p.3 (La. 6/3/94), 638 So.2d 216, 217, the Louisiana Supreme Court stated:

> The offense of aggravated battery "consists of the intentional use of force or violence, with a dangerous weapon, upon the person of another." *State v. Englerth*, 213 La. 158, 34 So.2d 409, 410 (La.1948); La.R.S. 14:34. The crime requires neither the infliction of serious bodily harm nor the intent to inflict serious injury. Compare La.R.S. 14:34.1 (Second Degree Battery); cf., *State v. Fuller*, 414 So.2d 306 (La.1982). The offense does require "physical contact whether injurious or merely offensive." *State v. Dauzat*, 392 So.2d 393, 396 (La.1980) [footnote omitted].

We find that the trial court did not err in removing aggravated battery from the list of responsive verdicts in this case. The evidence fails to show that the Defendant had any physical contact whatsoever with the victims. Therefore, this assignment of error is without merit.

### ASSIGNMENT OF ERROR NUMBER SEVEN

The Defendant complains the trial court erred in denying his motion for new trial on the ground the State made prejudicial remarks during its closing argument. He refers to the State's comment that his case is similar to a terrorist attack against U.S. soldiers in the Middle East. However, the Defendant failed to object to this

20

alleged error at trial. Pursuant to La.Code Crim.P. art. 841, this assigned error will not be considered on appeal as the Defendant did not make a contemporaneous objection at trial.

## ASSIGNMENT OF ERROR NUMBER EIGHT

The Defendant also complains the trial court erred in denying his motion for new trial on the ground that the trial court gave the improper definition of attempted manslaughter to the jury. He contends the court failed to define first degree murder or second degree murder as these offenses are mentioned in the manslaughter definition. However, the Defendant failed to object to this alleged error at trial. Pursuant to La.Code Crim.P. art. 841, this assigned error will not be considered on appeal as the Defendant did not make a contemporaneous objection at trial.

## CONCLUSION

Defendant's conviction is affirmed.

**AFFIRMED.**

21