NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

12-264

STATE OF LOUISIANA

VERSUS

ROGRICK M. VAN DYKE

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 7915-10
HONORABLE CLAYTON DAVIS, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

ELIZABETH A. PICKETT
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of John D. Saunders, Elizabeth A. Pickett, and James T. Genovese, Judges.

AFFIRMED.

John Foster DeRosier
14th JDC District Attorney
Carla Sue Sigler
Assistant District Attorney
P. O. Box 3206
Lake Charles, LA 70602-3206
(337) 437-3400
COUNSEL FOR APPELLEE:
        State of Louisiana

**Edward Kelly Bauman**
**La Appellate Project**
**P. O. Box 1641**
**Lake Charles, LA 70602-1641**
**(337) 491-0570**
**COUNSEL FOR DEFENDANT- APPELLANT:**
    **Rogrick M. Van Dyke**

**Rogrick M. Van Dyke**
**Louisiana State Penitentiary**
**Camp D, Raven 3-Right**
**Angola, LA 70712**

**PICKETT, Judge.**

## FACTS

On August 21, 2008, Rhonda Lewis, a close friend and co-worker of Rhonda Nelson, went to Ms. Nelson's house to check up on her because she did not report to work as expected. There, Ms. Nelson was found dead on her living room floor. The coroner's report listed the cause of death as asphyxiation and the manner of death as homicide. The defendant, Rogrick M. Van Dyke, Ms. Nelson's live-in boyfriend, was charged with her murder a year later after he was apprehended in Dallas, Texas.

The defendant was indicted for the August 21, 2008, murder of Ms. Nelson. A jury trial commenced on October 13, 2011, following which the defendant was found guilty of second degree murder, a violation of La.R.S. 14:30.1. The defendant filed a "Motion for New Trial" and "Defendant's Motion for Judgment of Acquittal" on October 28, 2011. A hearing was scheduled for November 4, 2011, the same date as the defendant's sentencing. The motions were denied in open court. The defendant was subsequently sentenced to life imprisonment without the benefit of parole, probation, or suspension of sentence.

The defendant has perfected a timely appeal, wherein he asserts that the evidence was insufficient to sustain a verdict of second degree murder.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record, we find no errors patent.

# ASSIGNMENT OF ERROR

The defendant asserts that he was convicted on circumstantial evidence alone, and the evidence the state offered did not exclude every reasonable hypothesis of innocence; therefore, the evidence did not support a verdict for second degree murder. The standard of review of sufficiency of the evidence is well established by Louisiana jurisprudence. In *State v. Hamilton*, 03-1385, pp. 13-14 (La.App. 3 Cir. 3/3/04), 867 So.2d 151, 160, *writ denied*, 04-1227 (La. 4/22/05), 899 So.2d 567, this court discussed the sufficiency of direct and circumstantial evidence:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied,* 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody,* 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino,* 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

> Further, when the conviction is based upon circumstantial evidence, La.R.S. 15:438 provides that such evidence must exclude every reasonable hypothesis of innocence. *State v. Camp*, 446 So.2d 1207 (La.1984); *State v. Wright,* 445 So.2d 1198 (La.1984). However, La.R.S. 15:438 does not establish a stricter standard of review on appeal than the rational juror's reasonable doubt standard.

The statute serves as a guide for the jury when considering circumstantial evidence.

At the trial, the following testimony was given.

Rhonda Lewis worked with the victim at Stine Lumber Company in Lake Charles. She testified that on August 21, 2008, she was asked to go to her friend's house and check on her because she did not show up for work or call to explain her absence. In late morning, she went to the victim's house. The victim's black Mercury Mountaineer was not in the driveway, and the porch light was on. The security bars on the front door were locked, but the inside door was opened a crack. She called 911 and reported that something was suspicious. The 911 operator told her to push the inside door open. When she did this, she could see the victim lying on the floor.

Michael Treadwell, a corporal with the Lake Charles Police Department, arrived shortly thereafter. He and another officer entered the house through the opened back door. He testified there was no evidence of a break-in. The victim was lying face-down on the living room floor.

Detective Gregory Single, a violent crime investigator with the Lake Charles Police Department, was the lead investigator in the case. He testified there was no evidence of a forced entry but that the contents of the victim's purse were spread out on an ottoman next to her body. The victim was fully clothed, made-up, and had her contacts in, as if she was ready to leave the house. Detective Single testified that the defendant showed up in the victim's vehicle at approximately 2:45 p.m. and became hysterical when told of the victim's demise. The defendant gave the police permission to search the vehicle and voluntarily went to the police station for a taped interview. The video was published to the jury.

The defendant testified that he and the victim had known each other for several years but had gotten together within the past year and a half. They had been living together for about a year and planned to marry soon. He told the officers that the night before, he and the victim had stayed up late watching movies. When they got up in the morning, the victim was preparing to go to work but stated she was feeling sick. The defendant encouraged her to stay home, and as he left the house around 7:05 a.m., she was sitting on the couch in front of her laptop computer, reaching for her phone to call in sick to work. The defendant said that he went shopping for a vehicle for himself. He stated he visited several used car lots throughout the morning. He did not speak with a sales person, just looked around. He said he called the victim around 8:30 a.m. to check up on her, but she did not answer her phone. Later, he decided to visit his sister in Beaumont. He visited with his sister for about ten minutes, shopped for a vehicle in Beaumont for a while, then headed back to Lake Charles. He said he called the victim on his way home and again she did not answer. The police checked his phone and saw there was a phone call to the victim's phone at 1:22 p.m. He stated that before he headed home, he stopped at Wal-Mart to shop for a television. While there, the victim's brother called him and told him there was an ambulance at the victim's house and that he had better go home.

During the interview, the police confronted the defendant with statements given by some neighbors who put the victim's vehicle at the house around 8:30 a.m. and again at about 11:30 a.m. Eventually, the defendant admitted that he had gone home before he went to Beaumont. He said he went in the front door, found the victim dead on the living room floor, and then he panicked. He did not call the police or an ambulance or attempt to help her because he could see she was dead.

4

He said he was scared to touch her because his DNA might "jump" onto her. He said he saw the back door open, her purse dumped out on the ottoman, and the laptop computer missing. He stated that they had several items stolen about a month prior—a bike, a lawnmower, and some other things, so he figured it was a burglary. He said he watched a lot of "cop" shows and knew that the boyfriend was always blamed. He stated he left and went to Beaumont to talk to his sister, but her daughter was with her so he just came back to Lake Charles.

Detective Single testified that next day he attempted to locate the defendant to set up another interview. The defendant, however, had disappeared. The defendant was apprehended in Dallas, Texas, in a homeless shelter, in November 2009 and returned to Louisiana. The detective subpoenaed both the victim's and the defendant's phone records. The defendant's phone record showed that he had called the victim at 11:35 a.m., 11:36 a.m., and 11:37 a.m. There were no outgoing calls indicated in the victim's phone records. The phone was never located, nor was the laptop computer. The detective further testified that later investigation turned up the fact that a month prior to the victim's death, the defendant had pawned a lawnmower at Chad's Pawn Shop just about the same time the defendant said a lawnmower was stolen from the house.

Christopher Doward, an officer with the Dallas Police Department, was the officer who located the defendant in Dallas and took him into custody. He testified that when advised why he was being arrested, the defendant stated: "My wife had done something-the last word was inaudible-should still be alive."

A neighbor, Anne Vanderwingearde, testified that she saw a dark blue Jeep parked in front of the victim's house with a man sitting inside the vehicle at about 9:30 or 10:00 a.m. on the morning of the victim's murder. Natalie Lemelle, a next

5

door neighbor, testified that she saw the defendant leave in the victim's car about 8:30 a.m. that morning.

A physician with the Calcasieu Parish Coroner's Office, Doctor Terry Welke, was accepted as an expert in forensic pathology. He performed the autopsy on the victim. He testified that the victim had various scrapes and scratches on her body. There were bruises on the back of her right forearm, a scrape on her upper left breast, scrapes on her elbows, and two superficial scrapes on her lower lip consistent and aligned with her upper incisor teeth. He testified that while she was overweight and had gallstones, there were no signs of a significant natural cause for her death. He speculated the cause of the victim's death was asphyxiation. He did not find indications that she was strangled. He stated it was as if someone sat on her back so that her chest could not expand to take in oxygen. He based this opinion on his finding of petechia, a pinpoint bruising on the inside of her lower eyelids which can be caused by asphyxiation.

In brief, the defendant argues that the state failed to establish all the elements of the crime of second degree murder. He argues that "[o]ther than the fact that Rogrick initially lied to police as he was scared, there was no evidence, direct or circumstantial, linking him to any crime." To prove second degree murder, the state had to prove that the defendant had the specific intent to kill the victim or to inflict great bodily harm. La.R.S. 14:30.1. Louisiana Revised Statutes 14:10(1), provides that "[s]pecific criminal intent is that state of mind which exists when the circumstances indicated that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." Furthermore, specific intent need not be proven as a fact, but may be inferred from the defendant's

6

actions and the circumstances of the transaction. *State v. Robinson*, 02-1869 (La. 4/14/04), 874 So.2d 66, *cert. denied*, 543 U.S. 1023, 125 S.Ct. 658 (2004).

The state's case was premised exclusively on the defendant's behavior and his inconsistent statements. In brief, the state argues that "[i]n this case, reason and common experience lead to one inevitable conclusion from the defendant's behavior: he killed the victim. In the matter *sub judice*, all the evidence points to the defendant and his guilty behavior. It was rumored that the defendant and the victim were heard arguing the night before her death." This "rumor" was transmitted to the jury during the police interrogation of the defendant. The rumor was never verified at trial, and the defendant had denied that he and the victim had argued the night before. The state points out that there was no sign of a forced entry into the house and that the defendant was the only other person living in the house with the victim. She was dressed and "ostensibly on her way to work," despite the defendant's story that she was feeling sick and had decided to not go to work that morning. The defendant initially lied about his whereabouts, then admitted he came home and found her dead. He did not, however, call the police or an ambulance. He stated he did not even touch her because he was afraid of leaving his DNA on her. As the state argues in its brief, "Even though the defendant knew that Ms. Nelson was dead, he called her three times so it would look like he was trying to check on her. People with nothing to hide do not call people that they know are already dead."

During the police interrogation, after the defendant attempted to explain he panicked and left the house, the police accused him of staging a burglary by rifling through the victim's purse, taking the laptop, and leaving the back door open. The jury heard the police tell the defendant that they had a statement from someone that

7

he was seen leaving out the back door with something in his arms. This statement was also not verified at trial.

> The state also argues that the defendant attempted to evade law enforcement

> not once, but twice. The first time was immediately following the murder when he left for Beaumont, Texas, in an attempt to create an alibi, and the second time was when he failed to appear for additional questions with Detective Single and was eventually found in a Dallas homeless shelter.

Evidence of flight, concealment, and attempt to avoid capture is relevant to show consciousness of guilt from which a jury may use to reach a verdict. *State v. Davies*, 350 So.2d 586 (La.1977). *See also State v. Burbank*, 07-125 (La.App. 5 Cir. 10/30/07), 971 So.2d 1173, *writ denied*, 07-2287 (La. 4/25/08), 978 So.2d 364.

In brief, the defendant asserts that the State did not eliminate every reasonable hypothesis of innocence beyond a reasonable doubt. He argues:

> His leaving for Dallas could be contributed to his being distraught over Nelson's death. His absence from Nelson's funeral does not prove a thing and was only brought up to inflame the jury. His statements to Officer Doward fall woefully short of a confession. Rogrick may have meant that if Nelson would have listened to him and locked the doors, this would not have happened. No DNA was recovered. No fingerprints were recovered. One neighbor saw a blue Jeep in front of the home between 9:30 and 10:00 a.m. Another neighbor saw Nelson's black Mercury Mountaineer being driven by Rogrick at the home, but he left before 8:30 a.m. It was never established who was in the blue Jeep. Dr. Welke opined that Nelson died from asphyxia, but could only guess how it may have happened. His autopsy report indicates the time of death as "a.m.." (S-5).

In the current case, all the evidence presented by the state was circumstantial. The defendant lived at the house with the victim. He lied about not knowing the victim was dead until he was summoned home, and he fled the state after he was questioned by the police. While there were statements made that conflicted with the defendant's version of events—that he and the victim argued the night before and that he was seen leaving out the back door with something in

his arms the morning the victim died—these statements were hearsay. However, there was no allegation of ineffective assistance of counsel on appeal for allowing the admission of these statements without objection. Therefore, the statements cannot be examined for their effect on the jury's verdict. Viewing the evidence in a light most favorable to the prosecution, it cannot be said that the jury's verdict was irrational under the circumstances of this case. *See State v. Mussall*, 523 So.2d 1305 (La.1988). We find the evidence sufficient to establish the essential elements of the crime beyond a reasonable doubt. Further, we find the evidence sufficient to support the jury's conclusion that every reasonable hypothesis of innocence was excluded by the state's evidence.

## CONCLUSION

The defendant's conviction is affirmed.

**AFFIRMED.**

This opinion is not designated for publication.
See Uniform Rules—Courts of Appeal, Rule 2-16.3