**COURT OF APPEAL, THIRD CIRCUIT**

**04-359**

**STATE OF LOUISIANA**

**VERSUS**

**WILLIAM GILES**

\*\*\*\*\*\*\*\*\*\*
APPEAL FROM THE
TWELFTH JUDICIAL DISTRICT COURT
PARISH OF AVOYELLES, NO. 02-CR-112029
HONORABLE MARK A. JEANSONNE, PRESIDING

\*\*\*\*\*\*\*\*\*\*\*\*\*\*
**SYLVIA R. COOKS**
**JUDGE**
\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Court composed of Sylvia R. Cooks, Marc T. Amy and John B. Scofield,[*] Judges.

**AFFIRMED.**

**Charles A. Riddle, III, District Attorney**
**Miche' Moreau, Assistant District Attorney**
**P.O. Box 1200**
**Marksville, LA 71351**
**(318) 253-6587**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**


**George L. Higgins, III**
**P.O. Box 3370**
**Pineville, Louisiana 71361-3370**
**(318) 473-4250**
**COUNSEL FOR DEFENDANT-APPELLANT:**
    **William Giles**

---

[*]John B. Scofield participated in this decision by appointment of the Louisiana Supreme Court as Judge *Pro Tempore.*

**COOKS, Judge.**

The Defendant, Williams Giles, appeals his conviction and seventeen year sentence on the charge of forcible rape. For the following reasons, we affirm the conviction and sentence.

## FACTS AND PROCEDURAL HISTORY

Defendant, William Giles, was charged by bills of indictment with one count of aggravated rape in violation of La.R.S. 14:42(A)(1) and one count of sexual battery in violation of La.R.S. 14:43.1 for viciously beating the victim about the head and face with his fists and raping the victim vaginally and anally with a beer bottle and forcing the victim to perform oral sex upon his person. Defendant was also charged with one count of theft in violation of La.R.S. 14:67. The grand jury returned a true bill on each of the three charges. Defendant was arraigned and entered a plea of not guilty.

After a trial by jury, Defendant was convicted of the lesser included offense of forcible rape in violation of La.R.S. 14:42.1. Defendant filed a "Motion for Post-Judgment Verdict of Acquittal Pursuant to LSA-C.C.R.P. art. 821 and Alternatively, an Application for New Trial Based on LSA C.C.R.P. art 851." A hearing was held on the motions. The State also filed a habitual offender bill against the Defendant. Defendant waived formal reading of the bill, entered a plea of not guilty and filed a motion to quash the habitual offender bill. The State dismissed the habitual offender bill and the trial court denied both the motion for post judgment verdict of acquittal and the motion for new trial and sentenced the Defendant to seventeen years at hard labor with two years to be served without the benefit of probation, parole or suspension of sentence.

Defendant appealed his conviction and sentence, alleging six assignments of error:

1.  The Trial Court erred in not granting Defendant's First Motion for Mistrial in that the Trial Court read to the jury an additional criminal charge which had not been brought by the State.

2.  The Trial Court erred in not granting Defendant's Second Motion for Mistrial in that the State witness, although he had been instructed on the Court's order, under direct question of the State, violated the Court's earlier order by alluding to obtaining a photo from a prior booking of the Defendant, showing past criminal evidence.

3.  The Trial Court erred in not granting Defendant's Third Motion for Mistrial in that a witness, during testimony, under direct questioning by the State, informed the jury that the Defendant was presently incarcerated but not for the current rape charge.

4.  The Trial Court erred in not granting Defendant's Motion for Post-Judgment of Verdict of Acquittal when the evidence is viewed in the light most favorable to the State a guilty verdict is not reasonable.

5.  The Trial Court erred in not granting Defendant's Motion for New Trial in that the Trial Court applied improper legal standards in determining the motion.

6.  The Trial Court erred by excessively sentencing the Defendant with a seventeen year prison sentence, not considering the circumstances and evidence in this matter.

## ASSIGNMENT OF ERROR NO. 1

In his first assignment of error, Defendant alleges the trial court erred in not granting his first motion for mistrial. Defendant asserts he moved for mistrial after the trial court read an additional criminal charge to the jury, which had not been brought by the State. After thoroughly searching the record, we are unable to find any mention of a motion for mistrial based upon the trial court incorrectly reading additional criminal charges to the jury. Defendant acknowledges the record does not reflect the motion for mistrial, but argues his trial counsel referred to it in arguing his motions for post verdict judgment of acquittal and new trial.

The State acknowledges that during a bench conference, Defendant moved for a mistrial, which was denied. However, it argues no additional charges were read to

the jury.

The record reveals the clerk read the Bill of Information into the record. After the bill was read, Defendant made a request to approach the bench; at which time a bench conference was held, but was not transcribed by the court reporter.**

During arguments regarding the Defendant's motions for post judgment verdict of acquittal and new trial, Defendant's trial counsel stated, "We respectfully submit in light of everything that went on in this case from the very beginning, from the very beginning reading two charges to them, to the very end." This statement by trial counsel is the only basis we have found in the record for the Defendant's allegation that a motion for mistrial was made.

The record reflects the following charge was read to the jury by the clerk:

> State of Louisiana, Parish of Avoyelles, Jury term 2002 in the Twelfth Judicial District Court in the (UNINTELLIGIBLE) and the State of Louisiana, the Grand Jurors of the State of Louisiana do elected, impaneled sworn and charged to (UNINTELLIGIBLE) and for the body of the Parish of Avoyelles in the Twelfth Judicial District and the State aforesaid, at a district Court begun and held in and aforesaid parish on the 5th day of June 2002 upon their oath present that William L. Giles, 390 Edward Gremillion Road, Hessmer, Louisiana, on or aboutht he 20th day of April, A.D. 2002 in the State, Parish, District and State aforesaid and within the jurisdiction of the Twelfth Judicial District Court did willfully, maliciously and (UNINTELLIGIBLE) violated provisions of Louisiana Revised Statute 14:42(A)1 entitled "Aggravated Rape" in that he did have vaginal and oral sexual intercourse with [the victim] without her lawful consent because she resisted the act to the upmost, but her resistance was overcome by force contrary to the form of the Statute of the State of Louisiana in such case may and provided against the dignity of the same. Docket number 112,029 State of Louisiana versus William L. Giles. The defendant entered a not guilty plea.

Our review of the record does not find where two charges were read to the jury. Thus, we are unable to find any basis in the record for the apparent motion for mistrial Defendant's trial counsel made during the untranscribed bench conference.

---

** All bench conferences in this record were not transcribed with the exception of one or two partially transcribed bench conferences.

Therefore, we find no merit in this assignment of error.

We also note appellate counsel could have argued the failure to transcribe the bench conference was error pursuant to La.Code Crim.P. art. 843 and resulted in an incomplete transcript. However, this argument was not made on appeal and Defendant did not make the requisite showing of prejudice needed to support such a claim.

## ASSIGNMENT OF ERRORS NOS. 2 & 3

In his second and third assignment of errors, Defendant argues the trial court erred in denying his motions for mistrial based on the improper mention of other crimes evidence.

First, Defendant argues the State's witness, Detective Eldon Sayes, improperly alluded to other crimes evidence when he stated, "I asked her . . . well, she had told me . . . give me the name of William Giles, so I contacted disradio . . . I'm sorry, booking and I asked them if they had a photo. . . ." At this point Defendant began to object, but was interrupted by the trial court who instructed counsel for both sides to approach. A bench conference, which was not transcribed, was held. After the bench conference, the jury was removed from the courtroom and arguments were heard on Defendant's motion for mistrial.

The Defendant moved for mistrial based on a motion in limine which was granted prior to trial.[***] During his argument on the motion for mistrial, the Defendant argued:

> At this time we move for a mistrial based on our motion we filed in

_____

[***] The minutes of the record suggest that a hearing on the Defendant's motion in limine to exclude other crimes evidence was held on September 4, 2003, but after a thorough search of the record, we are unable to locate any transcript of this hearing. The record shows that a motion in limine was filed on September 4, 2003, but the order attached to the motion is not signed. While the exact order of the court is not known, Defendant and the State discussed the motion in sufficient detail during arguments on the motion for mistrial to obtain the substance of the order. Additionally, Defendant does not assign any error concerning the motion in limine.

-4-

Limine that this court heard and granted on September the 4th which was that the court said that as far as photographic lineup that the prosecute [sic] admission there would be no reference to "either booking or a photo lineup" and that the prosecutor was specifically instructed to inform his witnesses to be prohibited and refrain from any reference to booking (UNINTELLIGIBLE)."

Defendant contended the reference to "booking" would lead the jury to assume that he had a prior criminal record.

The trial court denied the motion for mistrial stating, "I'm denying the Motion for a Mistrial because I just don't see the prejudice there. Although, perhaps, he should not have said I contacted booking, but that's already said." While the trial court did not specifically state its reasons for not instructing the jury, it can be inferred from the transcript that the trial court declined to instruct the jury in order to avoid calling further attention to the reference to booking.

La.Code Crim.P. art. 770 provides, in part:

Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:

. . . .

(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;

. . . .

An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial.

In *State v. Prudhomme*, 02-0511, pp. 11-12 (La.App. 3 Cir. 10/30/02), 829 So.2d 1166, 1174-75, *writ denied*, 02-3230 (La. 10/10/03), 855 So.2d 324, this court stated:

Interpreting La.Code Crim.P. art. 770, the Louisiana Supreme Court stated:

> A mistrial is warranted under La.Code Crim.P. art. 770 when certain remarks are considered so prejudicial and potentially damaging to a defendant's rights that even jury admonition could not provide a cure. *State v. Johnson*, 94-1379 (La.11/27/95), 664 So.2d 94. Potentially damaging remarks include reference to race or religion, when not material or relevant to the case, and direct or indirect reference to another crime committed or alleged to be committed by the defendant, unless that evidence is otherwise admissible. La.Code.Crim.P. art. 770. The comment must be made within earshot of the jury and must be made by a judge, district attorney, or other court official. *Id*. Comments must be viewed in light of the context in which they are made. *State v. Webb*, 419 So.2d 436, 440 (La.1982). Moreover, a comment must not "arguably" point to a prior crime; to trigger mandatory mistrial pursuant to Article 770(2), the remark must "unmistakably" point to evidence of another crime. *State v. Babin*, 336 So.2d 780 (La.1976)(where reference to a "mug shot" was not unmistakable reference to a crime committed by defendant); *State v. Harris*, 258 La. 720, 247 So.2d 847 (1971)(where no crime was evidenced by a police officer's reference to obtaining defendant's photograph from the Bureau of Investigation). In addition, the imputation must "unambiguously" point to defendant. *State v. Edwards*, 406 So.2d 1331, 1349 (La.1981), *cert. denied sub nom. Edwards v. La.*, 456 U.S. 945, 102 S.Ct. 2011, 72 L.Ed.2d 467 (1982). The defendant has the burden of proving that a mistrial is warranted. *See State v. May*, 362 So.2d 516 (La.1978).

> *State v. Edwards*, 97-1797, p. 19-20 (La.7/2/99); 750 So.2d 893, 906, *cert. denied*, 528 U.S. 1026, 120 S.Ct. 542, 145 L.Ed.2d 421 (1999).

We cannot say that Detective Sayes merely mentioning "booking" *unmistakably* points to a prior crime committed by the Defendant as required by Article 770(2).

Further, Article 770 requires that the person making the remark be either the judge, district attorney or a court official. This court has held, "A testifying police officer is not an 'official' within the meaning of La.C.Cr.P. art. 770(2)." *State v. Love*, 602 So.2d 1014, 1022 (La.App. 3 Cir. 1992), *citing State v. Hayes*, 414 So.2d

717 (La.1982); *State v. Foote*, 379 So.2d 1058 (La.1980).

In the alternative, Defendant argues the detective's statements are "clearly prejudicial" and are grounds for a mistrial under La.Code Crim.P. art. 771, which states in pertinent part:

> In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
>
> (1) When the remark or comment is made by the judge, the district attorney, or a court official, and the remark is not within the scope of Article 770;  or
>
> (2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.
>
> In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.

In *State v. Givens*, 99-3518, p. 12 (La. 1/17/01), 776 So.2d 443, 454, the supreme court stated the following with regard to denials of motions for mistrial, "A trial court's ruling denying a mistrial will not be disturbed absent an abuse of discretion." *Citing State v. Narcisse*, 426 So.2d 118, 133 (La.1983), *cert. denied*, 464 U.S. 865, 104 S.Ct. 202 (1983).

In *State v. Ducre*, 01-2778, p. 1 (La. 9/13/02), 827 So.2d 1120, the supreme court held:

> When a witness makes an irrelevant remark which might prejudice the defendant, La.C.Cr.P. art. 771 gives a trial court the option either to admonish the jury or, if an admonition does not appear sufficient, to declare a mistrial. Mistrial is a drastic remedy which should be declared only upon a clear showing of prejudice by the defendant; a mere possibility of prejudice is not sufficient. *State v. Smith*, 430 So.2d 31, 44 (La.1983); *State v. Wilkerson*, 403 So.2d 652, 659 (La.1981).  In addition, a trial judge has broad discretion in determining whether conduct is so prejudicial as to deprive an accused

-7-

of a fair trial. *State v. Sanders*, 93-0001, pp. 20-21 (La.11/30/94), 648 So.2d 1272, 1288-89; *State v. Wingo*, 457 So.2d 1159, 1166 (La.1984).

We find Detective Sayes' statement was not an unambiguous reference to an inadmissible other crime. His reference to "booking" was at best an ambiguous reference to some other unnamed crime. Defendant has failed to make the clear showing of prejudice required to mandate a mistrial under Article 771. Therefore, the trial judge did not abuse his discretion in denying the motion for mistrial, and this argument is without merit.

Second, Defendant argues the trial court erred in denying its motion for mistrial when a witness, Corey DeSoto improperly implied other crimes evidence when he stated that the Defendant was in jail, but "not for rape or anything like that." Again, under La.Code Crim.P. art. 770(2) and the case law interpreting that article, a Defendant must prove two things: first, that the person making the statement was the judge, district attorney or court official and second, that the statement does not "arguably" point to another crime committed by the Defendant, but must "unmistakably" point to another crime committed by the Defendant. *Prudhomme*, 829 So.2d 1166; La.Code Crim.P. art. 770.

Corey DeSoto was a witness called by the defense, but declared a hostile witness. He does not fit under the list of persons specified in Article 770. The statement also does not appear from the transcript to have been elicited by the State so as to be attributable to it as evidenced by the following colloquy:

> Q.     You had any other conversations with Shawn Gremillion about William Giles?
>
> A.     No, I asked if he had talked about it any to him and he said that he was in jail for (UNINTELLIGIBLE) and not for rape or anything like that.

This assignment of error is without merit.

By his fourth assignment of error, Defendant argues the trial court erred in failing to grant his motion for post verdict judgment of acquittal. Louisiana Code of Criminal Procedure Article 821(B) states a motion for post judgment verdict of acquittal "shall be granted only if the court finds that the evidence, viewed in a light most favorable to the state, does not reasonably permit a finding of guilty." With regard to a sufficiency of the evidence claim, this court has set forth the analysis as follows:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

This court in *State v. Hamilton*, 03-1385, pp. 13-14 (La.App. 3 Cir. 3/3/04), 867 So.2d 151, 160, further stated:

> [W]hen the conviction is based upon circumstantial evidence, La.R.S. 15:438 provides that such evidence must exclude every reasonable hypothesis of innocence. *State v. Camp*, 446 So.2d 1207 (La.1984); *State v. Wright*, 445 So.2d 1198 (La.1984). However, La.R.S. 15:438 does not establish a stricter standard of review on appeal than the rational juror's reasonable doubt standard. The statute serves as a guide for the jury when considering circumstantial evidence.

Defendant argues he was not the person who attacked the victim. In *State v.*

*Jones*, 02-1176, p. 13 (La.App. 3 Cir. 2/5/03), 839 So.2d 439, 446-47, *writ denied*, 03-886 (La. 11/7/03), 857 So.2d 516, this court quoted the supreme court as follows:

> The Louisiana Supreme Court in *State v. Neal*, 00-0674 (La.6/29/01); 796 So.2d 649, stated:
>
>> As a general matter, when the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the state is required to negate any reasonable probability of misidentification. *State v. Smith*, 430 So.2d 31, 45 (La.1983); *State v. Brady*, 414 So.2d 364, 365 (La.1982); *State v. Long*, 408 So.2d 1221, 1227 (La.1982). However, positive identification by only one witness is sufficient to support a conviction. *See State v. Mussall*, 523 So.2d 1305, 1311 (La.1988) (generally, one witness's positive identification is sufficient to support the conviction); *State v. Ford*, 28,724 (La.App.2d Cir.10/30/96), 682 So.2d 847, 849-50, *writ denied*, 99-0210 (La.5/14/99), 745 So.2d 12. . . . The trier of fact makes credibility determinations and may, within the bounds of rationality, accept or reject the testimony of any witness; thus, a reviewing court may impinge on the "fact finder's discretion only to the extent necessary to guarantee the fundamental due process of law." *Mussall*, 523 So.2d at 1310 (La.1988).

*Id*. at p. 11, 658.

The victim testified on the morning of April 20, 2002, she was asleep in her bedroom when she was awoken by a man entering her home and walking up and down her hallway yelling for someone named "Nell." The victim said her assailant stuck his head in her bedroom, at which time she told him to "get the hell out." She then put on clothes and went in the living room and found the man sitting on her couch. She entered the living room, opened the front door and sat in a chair in front of the door. The victim asked the man what his name was, and he replied, "they call me Boo Didely [sic]."

Her assailant then asked the victim if she remembered meeting him in the past. He informed the victim he had been at her house approximately a year ago to look at a tract of timber. The victim stated that after he reminded her, she remembered who

he was.

After spending approximately thirty minutes with her assailant inside her home waiting for it to get light outside, they then took a tour of her property which lasted about forty-five minutes. The victim testified during the tour they discussed people they both knew and her assailant stated he might be interested in purchasing the timber on her property.

After the tour of the property, the assailant asked the victim if he could borrow her phone, which she gave to him and then went to sit at a table in her front yard. While sitting in the front yard, the victim noticed someone else sitting in the assailant's truck. The victim approached the truck and asked the occupant if he would like to go sit at the table while her assailant was on the phone. The occupant got out of the truck, but before he could go sit down, the assailant motioned the victim over to him and the occupant got back into the truck.

When the victim approached her assailant, he grabbed her, pinned her down and began to beat her severely in her face. While beating her, the victim testified the assailant "still had the phone saying yeah, I'm sure it's the stupid bitch." The victim stated she was beaten so severely she used the bathroom on herself.[****] The assailant made the victim undress outside and go to the bathroom in the house. While in the bathroom, the victim testified to the following regarding the act of intercourse, which occurred in the bathroom:

> Q: And once you washed yourself off then what happened?
>
> A: Then he took me and slung me up against the wall like I was in a slouching sitting position and then he started raping me.
>
> Q: How was he raping you, ma'am?

---

[****]The sheriff's deputy who bagged the clothes as evidence, Detective LaBorde, did not indicate whether the clothes that he bagged were soiled in any way.

A: Well, he was trying to use his hand and plus he was using a beer bottle. Well, he was trying to push his penis in me with his hand.

Q: And was he successful in pushing his penis inside you?

A: Well, some, but and then he couldn't do nothing, so he started shoving it in my mouth and he'd use a beer bottle on me.

. . . .

Q: You said he used a bottle, where did he place the bottle?

A: Vaginally and anally.

Q: You mean, anally, in your rectum?

A: Yeah.

Q: At the time that he was attempting to place his penis inside of you, did he ejaculate at any point?

A: I don't believe of him doing that.

Q: (UNINTELLIGIBLE)?

A: No. Maybe when he shoved it in my mouth.

Q: Now, at what point did you get away from this man?

A: When he got through he washed the beer bottle off and he got to the bathroom door and he said don't you go anywhere bitch I'm coming right back. And he walked down the hall and then he came back and he looked in the door and then I heard him go get in his truck. When he cranked his truck up, I run found me some jeans and by then he was going out the driveway and I didn't even put a shirt on. I just had one of them throws on the couches and I wrapped that around me and I ran across the road to call 911.

Although she spent an hour and fifteen minutes with her assailant, the victim testified she could not recall whether her assailant had any facial hair. At the time of his arrest, Defendant had a goatee. The victim was never asked what color hair or eyes her attacker had, or what kind of pants or shirt he was wearing.

In her statements, the victim stated her assailant's truck was gray and blue. At trial, the victim testified the truck had a faded paint job and was blue and white with

a different color tail gate. The Defendant's truck was black and gray. The victim did not allege in her statements to Deputy Laborde or Detective Sayes that her truck had a different color tail gate.

The victim acknowledged she had been out to a bar the night before the incident. She stated she only had a "few" beers before coming home. She also admitted to "occasionally" using illegal drugs.

Detective Brian LaBorde, who at the time was a deputy with the Avoyelles Parish Sheriff's Office, testified he was the officer who responded to the victim's 911 telephone call. The Detective testified he arrived on the scene at approximately 8:30 on the morning of April 20, 2002, approximately forty-five minutes after the rape. He noted upon coming in contact with the victim, she appeared to have been beaten. Detective LaBorde stated the victim reported she had been asleep on the sofa in the living room, when the Defendant came in and woke her up to see about some lumber to be cut. The victim told Detective Laborde the Defendant told her his nickname was "Boo Didley." The Detective further stated the victim told him her attacker had attempted to perform sex with her, "which didn't happen." However, the victim stated when the Defendant could not maintain an erection he used a beer bottle to penetrate her and "then made her perform oral sex with him until he was finished."

Detective LaBorde testified the victim described her attacker as a "white male, big body guy, with a bad scar on his right arm, on the back side of his right arm." The victim further reported to Detective LaBorde the attacker was driving an old Chevy pick-up truck, approximately a 1984-1986 model, "blue over gray" color, with big tires.

Later in the afternoon of April 20, 2002, the victim contacted the sheriff's office and informed Detective LaBorde that she discovered her attacker was a man

-13-

by the name of "Booboo Giles from Hessmer." The Detective stated he knew that "Booboo Giles" was the Defendant from the victim's reference to the Defendant's "bad cut" on his arm and from his last name being Giles. Detective Laborde testified he knew the Defendant had a bad scar on his right arm because he was the first officer on the scene of the automobile accident in which the Defendant received the scar.

Detective Laborde stated he did not dust for fingerprints at the scene because he was a deputy, and dusting for fingerprints is generally done by the investigating detective. Detective LaBorde noted there was no detective on the scene to collect evidence while he was at the scene. He did bag the victim's clothing and shoes which were found in the yard for evidence, but they were returned to the victim at her request before any testing was performed on the items. Detective LaBorde also testified he took pictures of tire tracks that were in the victim's yard. He did not make a cast of these tire tracks because he did not have the proper equipment. He stated the detectives were in charge of making casts, but no detective came on the scene to collect such evidence.

On cross examination, the Detective stated he did not have in his report that the victim gave any specific information regarding the attacker's truck, such as the truck had a bright orange inspection sticker, a yellow tailgate or a red interior. According to Detective LaBorde, the victim stated she and her attacker were only in the trailer for five minutes before going outside to look at some timber to be cut.

Detective Eldon Sayes was a crime scene investigator and assistant coroner with the Avoyelles Parish Sheriff's Office. Detective Sayes first spoke with the victim on April 22, 2002, two days after the crime occurred. The victim contacted Detective Sayes at approximately 8:00 a.m. to inform him she knew who had committed the crime against her.

Detective Sayes asked the victim to come to the sheriff's office and give a written statement. The victim described the perpetrator's truck as being dark blue or black with silver or gray trim, battered and with big tires. The victim gave Detective Sayes the name of Defendant as the person who had raped her. Using this information, Detective Sayes put together a photographic lineup to show the victim. He showed the victim two separate lineups containing the same pictures in different orders and the victim picked out the Defendant as her assailant in both lineups.

The victim described her attacker as a white male, approximately 5'9" to 5'10" with a really big belly and a bad scar on his elbow. Detective Sayes stated at that time, the victim could not remember whether or not her attacker had any facial hair. She described the hair on his head as short in front and she was not sure about the back.

On the morning the victim met with Detective Sayes, she stated a heavy set white male woke her up when he entered her bedroom looking for a person named "Nell." She also informed Detective Sayes she and the perpetrator stayed in the trailer talking for approximately thirty minutes before going outside.

On cross examination, Detective Sayes testified after meeting with the victim on April 22, 2002, he typed up an affidavit and a warrant and gave it to the victim to take to the courthouse and see the judge. After giving the victim the affidavit and warrant to get signed, the Detective left for the day at approximately 11:00 a.m. At the time of typing the affidavit and warrant, the only information Detective Sayes had regarding the incident was Deputy LaBorde's report from two days prior and the victim's identification in the photographic lineups. Detective Sayes did not go to the crime scene until four or five days after the incident occurred. When he got to the scene, the victim was not home so he knocked on the door and left without doing any

further investigation. The Detective testified although the victim stated she and her assailant smoked several cigarettes behind the trailer, he did not collect any cigarette butts or other evidence for DNA testing.

Detective Sayes also stated the victim informed him her assailant used her cell phone to place a call. The phone records were subpoenaed, but the records were never received. The victim also reported her cell phone and a gun were taken by the assailant, but Detective Sayes did not execute any search warrant to determine if either item was in the possession of the Defendant.

Dr. Carol Smothers examined the victim at Avoyelles Hospital on April 20, 2002. She testified a general body examination and a pelvic examination were performed on the victim. She found small lacerations in the vagina, bruising around the anus and a little blood. She also noted swelling and bruising on the victim's face. She also ordered a urine test, which revealed the presence of marijuana in the victim's system. Her report did not indicate the victim was under the influence at the time of her examination.

Dr. Smothers did not perform a rape kit on the victim because she was not told there had been any attempt at penetration with a body part. While the nurse's notes indicated the victim was forced to perform oral sex, the doctor was not informed of that fact, and thus, did not perform an oral swab of the victim in an attempt to preserve DNA evidence.

James Hicks testified that he drove past the victim's home at approximately 7:00 or 7:30 on the morning of the incident, and noticed the assailant's truck parked in front of her home. He noticed there was a man sitting in the truck when he passed by. Mr. Hicks testified the truck was "an old Chevrolet or GMC truck. An old bluish, gray looking with a . . . like a rusty tailgate or something." He identified a

picture of Defendant's truck as the one he saw parked in front of the victim's home. Later that morning, when Mr. Hicks passed back by the victim's house he saw an ambulance and police car in the victim's yard. Mr. Hick's son, Willie Hicks, who was riding with his father at the time, corroborated his father's testimony.

The victim's step sister, Debra Dunn, testified that she knew both the Defendant and the victim. She further testified the Defendant went by the nicknames Boo Boo and Boo Didley. Later, Ms. Dunn testified she knew the Defendant as Boo Boo and referred to the Defendant as Boo Boo in her statements.

At trial the Defendant presented six alibi witnesses, who testified he could not have been the person who attacked the victim on the morning of April 20, 2002.

Janice Giles, Defendant's wife, testified her husband was home with her the night before the attack. She stated on the night of April 19, 2002, Caleb and Scott Guillot came by her home before midnight because Scott was having truck problems and wanted the Defendant to look at his truck. Ms. Giles testified her husband looked at the truck, but was unable to fix it. The next morning she stated the Defendant went to his brother's house around 7:00 a.m. with Ms. Giles' son, Caleb and Scott. Defendant went to get his brother, who is a mechanic, to look at Scott's truck. Ms. Giles testified they all returned home before noon. Ms. Giles stated she calls Defendant "Beau" and his family calls him "Boo Boo," but has never called him "Boo Didley."

Lansing Goudeau, Defendant's neighbor, testified he walks by the Defendant's house at the same time every morning and remembered seeing Defendant's truck in his driveway during the time the attack was alleged to have occurred. He stated he walked past Defendant's house at 6:00 a.m. on the morning of April 20, 2002. He also stated on the way back that morning, he stopped to speak with the Defendant

about working on a chicken pen. He stated that was at about 7:00 a.m. Mr. Goudeau testified Defendant, his step-son and two other guys were backing out of the Defendant's driveway when he walked by and stopped to speak to them.

Scott Guillott testified he and his brother stopped by Defendant's house on the night of April 19, 2002 with truck problems. Mr. Guillott testified he and his brother arrived at the Defendant's house at about 11:00 p.m. on April 19, 2002 and left with the Defendant around 7:00 a.m. the next morning. They stayed at Defendant's house that night rather than drive home, and the Defendant drove he, his brother and the Defendant's step-son to the Defendant's brother's home the next morning. They arrived at Defendant's brother's home around 7:45 a.m., and arrived back at Defendant's home around 11:30 a.m. He further testified he knows the Defendant as Beau or Boo Boo, but not Boo Didley.

William Frost, the Defendant's half brother, and his step-son, Scotty Thomason, verified Defendant and the three boys were at their home the morning of the attack on the victim. Mr. Frost testified Defendant drove up to his home as he was leaving for work at about 7:45 a.m. on the morning of April 20, 2002. Mr. Frost testified he just briefly spoke to Defendant in his driveway, and Defendant was gone when he returned from work at noon.

Scotty Thomason testified the Defendant drove up to his house at about 7:45 a.m. on the morning of April 20, 2002. He testified Defendant was in his truck with his step-son and two other guys. Mr. Thomason testified that the Defendant and his three passengers stayed at his home until about 10:30 or 10:45 a.m.

Villere Brevelle, Defendant's father-in-law, works full time with the sheriff's office. Mr. Brevelle testified that on the morning of April 20, 2002 at 7:00 a.m. he was at the Bunkie Police Station supervising juveniles performing community

service. While there he saw his son-in-law pass in front of the police station somewhere around 7:30 or 7:45 a.m. He remembered seeing a couple of heads in the truck besides his son-in-law.

The Defendant also presented evidence that Corey DeSoto committed the crimes. Mr. DeSoto testified that at the time of the incident, he lived across the street from the victim with his grandfather, Alton, his grandmother, "Nell," and his sister, Naomi. According to Mr. DeSoto, he and the victim were friends. Mr. DeSoto testified on the morning of April 20, 2002 his grandparents left about 5:00 a.m., and he was home alone. When he was leaving to go to work, between 6:30 and 7:00 a.m., Mr. DeSoto passed by the victim's house and the police were there. Deputy Laborde, who was first on the scene, testified he did not arrive at the scene until approximately 8:30. Mr. DeSoto accompanied the victim to the hospital and stayed with her afterwards.

Mr. DeSoto was convicted of second degree aggravated battery upon his grandfather, and also admitted he threw a ceramic vase at his grandmother and hit her in the arm. Mr. DeSoto testified he was in jail at the same time as the Defendant. While in jail, he shared a cell with Shawn Gremillion for about a month or a month and a half. Mr. DeSoto testified he did not tell Mr. Gremillion he had beaten the victim, nor did he tell him the Defendant was doing time for something he did. After being released from prison, Mr. DeSoto lived at the victim's trailer for about three weeks because he was ordered not to have any contact with his grandparents. Mr. DeSoto testified the victim was never his girlfriend and he slept on the couch when he spent the night the day of the incident. At the time of the incident, Mr. DeSoto had short hair and no facial hair.

Mr. DeSoto's grandmother, Nell Wiggins, testified in April of 2002, Mr.

DeSoto lived with her across the street from the victim. Ms. Wiggins testified she and her husband left about 5:00 a.m. on the morning of April 20, 2002 to go to north Louisiana and did not return until Sunday night. Ms. Wiggins testified when they returned, Mr. DeSoto's hands were injured and his knuckles were skinned. On rebuttal, the State recalled Ms. Wiggins who recanted her earlier testimony about her grandson's hands being injured when they returned on Sunday night.

Shawn Gremillion testified he knew Corey DeSoto and had met him in jail. Mr. Gremillion testified he voluntarily went to see Detective Eldon Sayes and had a conversation regarding Mr. DeSoto. He told Detective Sayes he and Mr. DeSoto were walking together to the prison commissary when they saw the Defendant. As they passed the Defendant, Mr. DeSoto began laughing, and Mr. Gremillion asked him what was so funny. Mr. DeSoto then told him the Defendant was serving time for something Mr. DeSoto had done. He went on to state his girlfriend came home from the club one night late and was drunk; they got into an argument during which he lost his temper and beat her up. Mr. Gremillion did not know how Mr. Giles had come to be blamed for it.

Shirley Wiggins Moore testified she knew Defendant because he used to come over to her home and visit her sons. Ms. Moore testified she knew the Defendant by the name of Boo Boo, but had heard him tell other people to call him Beau Didley, but she had never called him that.

Veronica Giles, the Defendant's ex-wife, testified Defendant worked as a mechanic and "did some timber stuff in the woods." She also testified she had never heard him called Beau Didley.

Margaret Gireaux testified she and her husband owned a timber business. Ms. Gireaux testified the Defendant worked for their timber business operating a "loader"

for one week sometime in 2000.

Cheryl LaBorde testified she is an "In-Take Administrator at the Avoyelles District Attorney's office for child support," and had access to work records for anyone who was paying child support through the State of Louisiana. According to her records some of the employers the Defendant had worked for were: Avoyelles Timber, Cloud Brother's Logging and Shackleford Logging.

With regard to witness or victim testimony, this court in *State v. Darbonne*, 01-39, pp. 3-4 (La.App. 3 Cir. 6/6/01), 787 So.2d 576, 579, *writ denied*, 02-533 (La. 1/31/03), 836 So.2d 64, held, "[a]bsent internal contradiction or irreconcilable conflict with physical evidence, one witness' testimony is sufficient to support a defendant's conviction of a sex offense, even where the State does not introduce medical, scientific, or physical evidence to prove the commission of the offense." We also note apart from the victim's testimony, the audio tape of the victim's 911 call was played to the jury and two eyewitnesses testified as to the presence of the Defendant's truck in the victim's yard on the morning of the rape. We find the victim's identification of the Defendant as her assailant and the other witnesses' testimony confirming the presence of a vehicle at the victim's home at the time of the offense matching the description of the one identified as belonging to Defendant is sufficient to support his conviction.

## ASSIGNMENT OF ERROR NO. 5

By this assignment of error, Defendant alleges the trial court applied an improper legal standard in denying his motion for new trial. Defendant argues the trial court could have granted him a new trial under either Article 851(1) or Article 851(5). We will review both claims.

La.Code Crim.P. art. 851 states, in pertinent part:

The court, on motion of the defendant, shall grant a new trial whenever:

(1) The verdict is contrary to the law and the evidence;

. . . .

(5) The court is of the opinion that the ends of justice would be served by the granting of a new trial, although the defendant may not be entitled to a new trial as a matter of strict legal right.

La.Code Crim.P. art. 858 states:

Neither the appellate nor supervisory jurisdiction of the supreme court may be invoked to review the granting or the refusal to grant a new trial, except for error of law.

This court has held when a trial court reviews a motion for new trial, the appropriate standard for re-weighing the evidence is the "thirteenth juror" standard. *State v. King*, 96-1303, pp. 5-6 (La.App. 3 Cir. 4/2/97), 692 So.2d 1296, 1299, *citing State v. Long* 590 So.2d 694 (La.App. 3 Cir. 1991).

In denying the Defendant's motion for new trial, the trial court stated:

The Motion for New Trial is . . . concerns and inquires so much of deeper review and the Court has considered the weight of the evidence (UNITELLIGIBLE) jurors and I don't believe I'm reviewing any standard reguarding [sic] new evidence . . . of the new evidence type of review, but I do sit as a thirteenth juror and I consider the weight of the evidence and I have thought back and pondered about this case probably more than the attorneys have, believe it or not, about every witness that sat on that witness stand and this was how can I say a tough case. And many times someone is convicted . . . those cases of circumstantial evidence where you don't have the smoking gun and in this case there were (UNINTELLIGIBLE) and judgment calls made by the defense, but probably appropriate ones, but the weight of the evidence is what this court has considered and the court will deny the motion for a new trial because the court believes that we start with the audio tape which was played into evidence and the victim making her statements immediately after an event, harmful event. And the two witnesses who then say they saw the truck, description of the truck . . . I think there is . . . it's the court's opinion that justice was served. There was a full trial and full opportunity to cross examine and present the contradictory view or version of events and I sat through everything and absorbed everything. And I paid close attention to these motions and studied them hard, the applicable law. It has been filed into evidence the theory from the defense that it was a setup, a setup job. It just . . . ultimately though the logic just doesn't show that as being or as creating

a reasonable doubt. Not when you go back from day one of the trial and review all of the evidence submitted. So, you know, the court will deny the Motion for a New Trial and it was expressed in various elements, but the court will deny that motion.

In *State v. Snyder*, 98-1078, p. 37 (La. 4/14/99), 750 So.2d 832, 859, n. 21 (alteration in original), the supreme court stated:

In the instant case, the constitutional issue of sufficiency is treated in assignment of error number 1 because the denial of a motion for new trial based upon La.C.Cr.P. art. 851(1) is not subject to review on appeal. *State v. Skelton*, 340 So.2d 256, 259 (La.1976) ("[W]e have uniformly held that a bill of exceptions reserved to the refusal of the trial judge to grant a motion for a new trial based on Article 851(1), relative to sufficiency of the evidence presents nothing for our review.") (citations omitted); *State v. Bartley*, 329 So.2d 431, 433 (La.1976) ("It is well established in Louisiana that an assignment of error reserved to the denial of a motion for a new trial alleging that the verdict is contrary to the law and the evidence presents nothing for appellate review.") (citations omitted).

As the trial court used the correct standard of reviewing the motion for new trial, this assignment of error is not reviewable pursuant to La.Code Crim.P. art. 858 and *State v. Snyder*.

Defendant argues in the alternative, the trial court should have granted his motion for new trial under La.Code Crim.P. art. 851(5). La.Code Crim.P. art. 851(5) states, in pertinent part, "The court is of the opinion that the ends of justice would be served by the granting of a new trial, although the defendant may not be entitled to a new trial as a matter of strict legal right."

This court has routinely held that denial of a motion for new trial to serve the ends of justice is not subject to review upon appeal. *State v. Jason*, 01-1428, p. 9 (La.App. 3 Cir. 7/10/02), 820 So.2d 1286, 1292, *citing State v. Prudhomme*, 532 So.2d 234 (La.App. 3 Cir. 1988), *writ denied*, 541 So.2d 871 (1989).

**_____ASSIGNMENT OF ERROR NO. 6**

In his sixth assignment of error, Defendant contends the trial court's sentence of seventeen years is constitutionally excessive. The record does not indicate that the Defendant filed a motion to reconsider sentence, nor does the record indicate that the Defendant orally objected to the sentence at the sentencing hearing. According to La.Code Crim.P. art. 881.1, a defendant has thirty days following the imposition of sentence to make or file a motion to reconsider sentence. It further states that failure to make or file a motion to reconsider sentence precludes a defendant from raising on appeal any objection to the sentence. When the record does not indicate that any objection was made regarding sentencing, the defendant is precluded from appealing his sentence. *State v. Joubert*, 97-1093 (La.App. 3 Cir. 2/4/98), 705 So.2d 1295, *writ denied*, 98-1525 (La. 10/30/98), 723 So.2d 973, *citing State v. Smith*, 95-1215 (La.App. 3 Cir. 4/3/96), 672 So.2d 211; *State v. Myles*, 616 So.2d 754 (La.App. 1 Cir.), *writ denied*, 629 So.2d 369 (La.1993). Thus, Defendant's excessive sentence claim is barred pursuant to Article 881.1. However, we will review the sentence under a bare excessiveness review.

This court has set forth the following standard to be used in reviewing excessive sentence claims:

> La.Const. art. I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. *State v. Campbell*, 404 So.2d 1205 (La.1981). The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. *State v. Etienne*, 99-192 [p.5] (La.App. 3 Cir. 10/13/99); 746 So.2d 124, *writ denied*, 00-0165 (La.6/30/00); 765 So.2d 1067. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. *State v. Cook*, 95-2784 [p. 3] (La.5/31/96); 674 So.2d 957, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).

*State v. Barling*, 00-1241, 01-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042-43, *writ denied*, 01-838 (La. 2/1/02), 808 So.2d 331.

In order to decide whether a sentence shocks the sense of justice or makes no meaningful contribution to acceptable penal goals, this court has held:

> [A]n appellate court may consider several factors including the nature of the offense, the circumstances of the offender, the legislative purpose behind the punishment and a comparison of the sentences imposed for similar crimes. *State v. Smith*, 99-0606 (La.7/6/00); 766 So.2d 501. While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." *State v. Batiste*, 594 So.2d 1 (La.App. 1 Cir.1991). Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case." *State v. Cook*, 95-2784 (La.5/31/96); 674 So.2d 957, 958.

*State v. Smith*, 02-719, p. 4 (La.App. 3 Cir.), 846 So.2d 786, 789, *writ denied*, 03-562 (La. 5/30/03), 845 So.2d 1061.

Defendant was convicted of forcible rape. La.R.S. 14:42.1 states, in pertinent part, "Whoever commits the crime of forcible rape shall be imprisoned at hard labor for not less than five nor more than forty years. At least two years of the sentence imposed shall be without benefit of probation, parole, or suspension of sentence." The Defendant received a sentence of seventeen years with two years to be without benefit of probation, parole or suspension of sentence.

At sentencing the trial court stated:

> I have again sat through the trial of this matter. I have read the pre-sentencing investigation report and all of the correspondence and letters submitted and I've read them carefully and they have had an impact.

> I will review Code of Criminal Procedure Article 894.1 just to ponder and note for the record whether or not they are aggravating or mitigating circumstances.

> . . . .

The sentencing guidelines (UNINTELLIGIBLE).

The . . . I know that treats [sic] and violence were a part of this crime for which the defendant has been convicted and I don't see anything else worth reading out of the Code, but certainly a mitigating circumstance would be the defendant's lack of a violent history. (UNINTELLIGIBLE) circumstances would include the . . . and I'm not going to go through everything in detail, but the victim was beaten and forced into sexual activity and I'll just note for the record that the Court has considered aggravating and mitigating circumstances.

This is a crime of violence I must note that to Mr. Giles and as his attorney has indicated the eighty-five percent rule and I'm sure his attorney has explained that to him. This is a crime of violence as defined by our code, Revised Statutes entitled [sic] 40. Mr. Giles, will received credit for time served. I carefully consider this case. Again, I ponder the (UNINTELLIGIBLE) made in this case by all sides. I don't know if it'll be fair. What has stuck in the Court's mind and (UNINTELLIGIBLE) is the audio tape with the allegations therein which would almost . . . which are very compelling in the Court's opinion.

The Court has pondered the sentence greatly, but this is an extremely serious offense for which the defendant is convicted and this Court will sentence Mr. Giles to serve in the Custody of the Louisiana Department of Corrections a sentence a total sentence of seventeen years. You will receive credit for time served. He has a right to appeal pursuant to the Code of Criminal Procedure Article 914 and he has two years in which to apply for post conviction relief (UNINTELLIGIBLE). All right. Thank you ladies and gentlemen. That's the sentence of the Court.

. . . .

Finally, at least two years of the sentence imposed shall be without the benefit of probation, parole or suspension of sentence.

Two years of the sentence shall be without the benefit of probation, parole or suspension of sentence.

The trial court adequately discussed the aggravating and mitigating circumstances.

Defendant was sentenced to less than half of the possible forty year maximum given

by the statute and was only sentenced to the minimum amount of two years without

benefit of probation, parole or suspension of sentence. Thus, we cannot say the trial

court abused its vast discretion in sentencing the Defendant.

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find one error patent.

The trial court sentenced Defendant on the same day it denied his motion for post-verdict judgment of acquittal and motion for new trial. Louisiana Code of Criminal Procedure article 873 requires a delay of twenty-four hours after the denial of a motion for new trial. That article provides in pertinent part:

> If a motion for new trial, or in arrest of judgment, is filed, sentence shall not be imposed until at least twenty-four hours after the motion is overruled. If the defendant expressly waives a delay provided for in this article or pleads guilty, sentence may be imposed immediately.

This court has found an express waiver occurs when defense counsel responds affirmatively when the trial court asks if he is ready for sentencing. *State v. Williams*, 01-998 (La.App. 3 Cir. 2/6/02), 815 So.2d 908, *writ denied*, 02-578 (La. 1/31/03), 836 So.2d 59. *See also State v. Marcotte*, 01-1586 (La.App. 3 Cir. 5/15/02), 817 So.2d 1245, *writ denied*, 02-1687 (La. 2/7/03), 836 So.2d 96. After the trial court denied the motion for post verdict judgment of acquittal and motion for new trial in the present case, it asked the question, "Are you ready for sentencing?" The record reflects a response by the prosecutor but no response by defense counsel. Therefore, it cannot be said Defendant *expressly* waived the delay in sentencing.

However, even in the absence of an express waiver, this court has found implied waivers in certain circumstances. Thus, we must determine if the record establishes an implied waiver by Defendant in the present case.

Defense counsel voiced no objection when sentencing was taken up immediately after the denial of the motion for post verdict judgment of acquittal and the motion for new trial. After arguments were presented by the State, defense

counsel argued in support of a lenient sentence, filing letters submitted on Defendant's behalf and citing to the contents court one letter in particular. Defense counsel also referred to the sentencing range and the period of time already spent in jail by the Defendant. Although the entire sentence could be imposed without benefit of parole, probation or suspension of sentence, defense counsel argued that only the minimum (two years) should be imposed without these benefits.

When giving its reasons for the sentence imposed, the trial court noted that it had sat through the trial in the matter, had read the pre-sentence investigation report and had read the letters and correspondence submitted. After citing both aggravating and mitigating factors, the trial court sentenced Defendant to a lower range sentence of seventeen years at hard labor, with the first two years to be served without benefits.

In *State v. Taves*, 02-709 (La.App. 3 Cir. 1/15/03), 846 So.2d 1, *affirmed in part, reversed in part on other grounds*, 03-0518 (La. 12/3/03), 861 So.2d 144, this court found a waiver of the twenty-four-hour delay, noting that defense counsel failed to voice an objection even though he was clearly aware that the sentencing was scheduled to be taken up the same day the motion for new trial would be heard. Additionally, we noted that after the trial court denied the motion for new trial and told the defendant to come up for sentencing, defense counsel declared his intent to present evidence at the hearing. In addition to presenting evidence, defense counsel argued for a suspended sentence and stated he had reviewed the PSI and discussed it with the defendant. Finally, this court noted that defense counsel did not raise as error the trial court's failure to delay sentencing and did not allege prejudice. Although this court found an implied waiver of the article 873 delay, we found the sentences imposed were excessive and remanded for resentencing. In response to the State's application for review, the supreme court reversed this court's finding of

excessiveness and reinstated the sentences without any mention of the trial court's failure to abide by the delay required by La.Code Crim.P. art. 873. (*See also State v. Schmidt*, 99-1412 (La.App. 3 Cir. 7/26/00), 771 So.2d 131, *writ denied*, 00-2950 (La. 9/28/01), 798 So.2d 105, *cert. denied*, 535 U.S. 905, 122 S.Ct. 1205 (2002), for a thorough discussion of the jurisprudence regarding express and implied waivers of the twenty-four-hour delay period required by La.Code Crim.P. art. 873.)

The present case is similar to *Taves* in that the record contains no colloquy between the trial court and the Defense regarding its readiness for sentencing. However, as in *Taves*, defense counsel presented arguments to the trial court in support of a lenient sentence and the trial court supported the sentence imposed with ample reasons. Unlike the defense counsel in *Taves*, the defense counsel in the present case did not present evidence at the sentencing hearing. Additionally, the record in the present case is not as clear as the record in *Taves* as to defense counsel's knowledge that sentence would be imposed immediately after the disposition of his motion for new trial and motion for post-verdict judgment of acquittal. However, Defendant here makes no claim of prejudice because of the failure to abide by the delay. Considering these facts, we find *Taves* analogous and find an implied waiver occurred in the present case.

## DECREE

For the foregoing reasons, the Defendant's conviction and sentence are affirmed.

**AFFIRMED.**